Clifford ACREE, et al., Plaintiffs,

v.

The REPUBLIC OF IRAQ, et al., Defendants.

No. CIV.A. 02–632 (RWR).

United States District Court, District of Columbia.

July 7, 2003.

Anthony A. Onorato, Brian J. Newquist, David Davis Smyth, Stephen A. Fennell, Steptoe & Johnson LLP, Washington, DC, John Norton Moore, Alexandria, VA, for plaintiffs.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

ROBERTS, District Judge.

Plaintiffs, former prisoners of war ("POWs") during the Gulf War in 1991 and their close family members, filed this law-

suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.* (2000). Plaintiffs seek damages for the injuries they allege they suffered as a result of the torture inflicted on the POW plaintiffs while in Iraqi captivity. The Republic of Iraq, Saddam Hussein, and the Iraqi Intelligence Service were properly served pursuant to 28 U.S.C. § 1608 and are in default. Based on a thorough review of the full record in this case,[1] the Court makes the following findings of fact and conclusions of law in support of final judgment against defendants and an award to plaintiffs of compensatory and punitive damages.

### *BACKGROUND*

Seventeen of the twenty-one American troops held captive by Iraq during the first Gulf War and thirty-seven of their immediate family members filed this lawsuit against the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein, in his official capacity, alleging personal injuries suffered by the POWs caused by torture during their captivity, and suffered by their family members resulting from the acts of torture inflicted on their loved ones. Plaintiffs seek compensatory damages for bodily injury, emotional distress, economic injury, pain and suffering, and solatium. They also seek punitive damages to prevent future mistreatment of American POWs and their families.

The Court has jurisdiction over this action against a foreign state under 28 U.S.C. § 1330. Foreign states have no immunity from lawsuits seeking monetary damages for personal injuries caused by an act of torture or the provision of material support or resources for such torture by a state designated as a state sponsor of

---

1. The evidentiary record includes the affidavits filed by each plaintiff, the affidavits filed by plaintiff's experts, plaintiffs' medical records, and videotaped depositions of certain plaintiffs.

terrorism at the time the torture occurred, if such act or provision of material support is engaged in by an official or agent of such foreign state while acting within the scope of his or her office or agency. 28 U.S.C. § 1605(a)(7). The Republic of Iraq was designated as a state sponsor of terrorism in September 1990, prior to the torture and mistreatment of American POWs and their family members of which plaintiffs complain here, and was so designated throughout the Gulf War in 1991.[2] The plaintiffs in this case are United States nationals, and they repeatedly offered defendants an opportunity to arbitrate their claims in accordance with accepted international rules of arbitration.

Plaintiffs effected service of process on defendants through the United States Interests Section of the Embassy of the Republic of Poland in Baghdad on July 22, 2002, pursuant to 28 U.S.C. § 1608. Defendants were required by 28 U.S.C. § 1608 to file an answer or otherwise to respond within sixty days after proper service was made, but failed to do so. The Clerk of Court entered default against defendants on September 25, 2002. Both the Clerk of Court and plaintiffs' counsel notified the defendants of the existence and terms of the Court's scheduling order of December 20, 2002, which established a March 31, 2003 deadline for the submission of a statement on damages. Defendants neither filed a pleading contesting liability nor requested an extension of time to do so. Defendants received adequate notice of this lawsuit and of all deadlines, and they elected not to appear.[3]

This Court cannot enter a final judgment by default against a foreign state or its political subdivisions, agencies or instrumentalities "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs have submitted uncontroverted evidence that the defendants are liable for the torture of the POW plaintiffs and the intentional infliction of emotional distress on their family members. Plaintiffs have established their right to relief and to an award of damages by clear and convincing evidence which is satisfactory to the Court and which would permit a reasonable jury to find for the plaintiffs if this were a contested proceeding.

## FINDINGS OF FACT

### I. FACTUAL BACKGROUND

On August 2, 1990, the Republic of Iraq, acting at the direction of Iraqi President Saddam Hussein, attacked and occupied the State of Kuwait. In response, the United Nations ("UN") Security Council adopted Resolution 678, authorizing member states to use all necessary means to implement earlier UN Security Council Resolutions directing Iraqi forces to leave Kuwait. On January 16, 1991, an international coalition of thirty-three nations led by the United States initiated military action against Iraq.

Between January 17, 1991, and repatriation in early March of 1991, a number of coalition personnel, including the POW plaintiffs in this case, were held in Iraqi captivity. Most had been in aircraft that were downed over Iraq or Kuwait and several suffered injuries when their aircraft were downed.

---

**2.** *See Determination Iraq,* 55 Fed.Reg. 37,793 (Sept. 13, 1990) (stating that "Iraq is a country which has repeatedly provided support for acts of international terrorism"); 15 C.F.R. § 746.3(b) (2002); *Daliberti v. Republic of Iraq,* 146 F.Supp.2d 19, 25 (D.D.C.2001).

**3.** The Republic of Iraq did not lack an understanding of how to challenge a § 1605(a)(7) action as it previously has done so in this district. *See Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38 (D.D.C.2000).

Officials of the Republic of Iraq violently tortured all of the POW plaintiffs during their captivity. The POW plaintiffs were held for different periods of time and the specifics of their torture varied. Apparently because the Iraqi captors believed pilots had more sensitive information, the pilot POWs were tortured more severely than other POWs. The torture inflicted included severe beatings, mock executions, threatened castration, and threatened dismemberment. The POWs were systematically starved, denied sleep, and exposed to freezing cold. They were denied medical care and their existing injuries were intentionally aggravated. They were shocked with electrical devices and confined in dark, filthy conditions exposing them to contagion and infection. The POWs suffered serious physical injuries, including broken bones, perforated eardrums, nerve damage, infections, nausea, severe weight loss, massive bruises, and other injuries.

Iraqi agents caused the POWs to experience severe mental anguish by falsely reporting that they had killed Americans, including a pilot's wingman, other American POWs, and the President of the United States. The POWs suffered from knowing the agony that their families were enduring because the Iraqi authorities refused to inform the families that the POWs were alive. The Iraqi captors attempted unsuccessfully to degrade the POWs by urinating on them, and some POW plaintiffs were subjected to forced circumcision inspections to determine if they were Jewish. There is no indication that the POWs previously suffered from the extreme mental anguish and psychological harm that followed their captivity.

Iraq also used the POWs as "human shields" and held them captive in a legitimate military target. On January 21, 1991, only five days after the start of hostilities, Iraq announced this policy over Baghdad Radio. This was a profound source of anguish for the POWs' family members. When Allied forces bombed the regional Iraqi Intelligence Service Headquarters on February 23, 1991, not knowing that the POWs were incarcerated there, many of the POW plaintiffs narrowly escaped death.

The Iraqi torture of the POW plaintiffs was carried out in a common pattern of beatings upon capture and during captivity as punishment, beatings and other torture during extensive interrogations in an effort to extract information, random beatings unconnected to interrogations, and beatings in an effort to force the POWs to make verbal and videotaped statements and "confessions" to be used as propaganda.

No American POWs were permitted to notify their families of their capture and current state of health. As a calculated part of the torture of the POWs and their family members, Iraq refused all requests by both the POWs and the International Committee of the Red Cross ("ICRC") for notification of capture. For the POWs, this was a special dimension of the torture and mental anguish as they worried about their loved ones. Although the POWs did not opt for their captivity or torture, many experienced guilt for causing anguish to their families and friends. For spouses and other family members in the United States, Iraq's refusal to permit notification produced severe mental anguish. Several spouses did not know whether they were wives or widows. Other spouses who learned of their husband's capture through released Iraqi propaganda tapes suffered mental anguish knowing that their loved ones would allow themselves to be videotaped only if severely tortured.

The POWs and their families have continued to suffer over the years since repatriation. For many, the physical and mental effect of the torture and mental anguish

produced lasting damage. Some have permanent physical impairments. Some have undergone painful and extensive medical treatments in an effort to reverse the damage done by their captors in Iraq. All have suffered the effects of lasting emotional harm, whether to their marriages, their relationship with their families and friends, or their professional lives.

## II. PLAINTIFFS

### A. POW Plaintiffs

#### Colonel Clifford Acree

Col. (then-Lt.Col.) Clifford Acree's OV–10 "Bronco" aircraft was shot down by a surface-to-air missile in Kuwait on the first day of the war. He suffered a whiplash-like injury to his neck during the ejection procedure. Within minutes, he was taken prisoner by Iraqi soldiers. He was restrained with handcuffs that were so tight they cut off circulation and cut into his wrist bone, causing significant pain and causing his hands to swell and become numb. During his transportation to Baghdad, he was brutally beaten, often in time to music.

In Baghdad, interrogations and brutal beatings continued around the clock for several days, each episode lasting from twenty minutes to an hour. Col. Acree was threatened with death if he did not cooperate. He was struck with fists and other instruments to his entire upper body, but his captors cruelly focused on his injured neck. Because he was blindfolded, he never knew where the blows were coming from. The beatings were so frequent, however, that he learned to distinguish between the sound of a closed fist and that of other weapons. He also had to endure the agony of hearing other POWs being tortured.

His captors determined that he was a lieutenant colonel and a squadron leader, and they correctly assumed he had important, detailed military information. At that point, the interrogations and beatings became worse. The Iraqi captors tortured him violently in a futile attempt to extract valuable strategic information. Often, the beatings ended only when he was rendered unconscious. Despite the relentless torture, Col. Acree refused to provide information that would have endangered the Allied forces.

Col. Acree's captors also tormented him with stories of torture they had inflicted on POWs in the Iran–Iraq war. One interrogator told him about the interrogation of an Iranian pilot, in which they had taken a period of three days to cut off one of his testicles. When Col. Acree was later subjected to an inspection to determine if he was circumcised, he feared that he would suffer the same fate as the Iranian pilot.

The guards beat Col. Acree's head with such force that they broke his nose and fractured his skull. After the first few days of torture, he could not walk without assistance. The guards subjected him to mock executions and injected him with an unidentified drug during an interrogation. They forced him to make a propaganda video, but he refused to read the scripted message and, instead, merely sent a message intended to let his wife and family know that he was alive. He steadfastly refused to denounce the president or the Allied effort and, as a result, he was beaten even more severely.

Col. Acree was held in a freezing, dirty cell at the Iraqi Intelligence Service regional headquarters. His diet was so meager that he lost approximately 30 pounds during his captivity. Death from starvation alone was likely had the war lasted much longer. To survive, he ate a small piece of soiled bread he found behind the toilet and he ate the scabs off his own body. He developed conjunctivitis, lice infestation, and a severe intestinal disorder from the unsanitary conditions.

The building in which Col. Acree was held, a legitimate military target, was bombed by Allied forces on February 23, 1991. Col. Acree survived the bombing—a bombing which probably prevented the threatened dismemberment he was to have suffered the next day.

During his forty-seven days in captivity, his status as a POW was never reported by Iraq. The fear he experienced throughout his captivity that his wife had been given no information about his capture and status as a POW unfortunately was well founded.

Following his release, Col. Acree experienced insomnia and outbursts of anger. He feared losing control of his behavior. He believes that his marriage was affected by his impatience, his reduced emotions, and his reluctance to depend on anyone else. He had to undergo four painful reconstructive surgeries to repair his shattered nose and septum and broken facial bones, and to align airways in his skull. Each surgery brought back vivid flashbacks of the torture endured while in captivity in Iraq. As a result of having his nose repeatedly bludgeoned by his captors, he completely lost the sense of smell for several years, and it remains impaired to this day.

Col. Acree's hands remained numb for months after his release. He still suffers ongoing numbness in two fingers of his right hand from the Iraqi torture. He also has a rapid heart beat during medical exams and physical exercise. He has considerable hearing loss, and sudden noises startle him. His neck often becomes stiff and sometimes produces sharp pains, incapacitating him for two to five days at a time.

In 1992, Col. Acree was diagnosed with Post–Traumatic Stress Disorder ("PTSD") arising from his mistreatment in Iraq. In 1998, while on assignment to NATO, he suffered what was diagnosed as a Major Depressive Episode coincident with a recurrence of PTSD. He returned to the United States, where he was placed on medical leave during seven months of psychiatric treatment. He still suffers a number of problems caused by his captivity, including rapid and irregular heartbeat, low back pain, night sweats, headaches, nervousness when stressed, irritability when tired, numbness and tingling in his upper extremities, and some hearing loss and tinnitus.

The mistreatment of Col. Acree by his captors has significantly reduced the quality of his life during the twelve years since his release. He is not the same person he was before he became a POW, and has not been able to return to full mental and physical health. As a result, he will always suffer the consequences of his captors' inhumane treatment.

### Lt. Colonel Craig Berryman

The Harrier aircraft piloted by Lt. Col. Craig Berryman was shot down near Kuwait City on January 28, 1991. His wingman reported seeing the plane hit the ground and explode, but he did not see a parachute emerge and believed Lt. Col. Berryman had died in the crash.

Upon his initial capture, Lt. Col. Berryman was beaten by Iraqi soldiers using their fists and rifle butts. He was then taken to a series of bunkers in Kuwait for interrogation. One of his interrogators commented that Lt. Col. Berryman's failure to make radio contact meant that he was presumed dead and, therefore, his captors could kill him with impunity. As a result, Lt. Col. Berryman was extremely concerned that his family would never know what happened to him. When he continued to refuse to answer questions during an interrogation, his captors knocked him to the ground, cuffed his hands behind his back, and then jerked him up roughly by the chain linking his

handcuffs, making them as tight as possible.

When the guards brought him out of the interrogation bunker, a number of Iraqi soldiers punched, kicked, and spit on him. While waiting in an Armored Personnel Carrier that would transport him to Basra, Lt. Col. Berryman felt a guard's fingers running through his hair as if part of a sexual advance. Blindfolded and handcuffed, he was helpless to prevent any assault that might ensue. At that point, two more guards entered the vehicle and began beating Lt. Col. Berryman's head. To ensure that Lt. Col. Berryman would take the full impact of each punch, one guard held Lt. Col. Berryman's head against the guard's knee while the other two guards punched him. That prevented him from using protective techniques he had learned as a boxer in college.

At Basra, Lt. Col. Berryman was inspected to determine whether he was circumcised, and he was questioned about his religion. When he answered that he was a Baptist, his captors called him a "lying Jew." A guard then hit his left leg below the knee with an instrument that felt like a heavy club. Lt. Col. Berryman immediately collapsed in excruciating pain—this blow had broken the fibula in his left leg. Another guard then used a similar club to attack his right leg. The two guards continued beating him as he rolled on the floor trying to protect his left leg.

As he continued to resist answering their questions, Lt. Col. Berryman was told that if he did not answer their questions they would break his other leg. Two guards pinned him to the wall and one kicked his left leg, causing him to collapse to the ground in pain. The others began kicking and beating him. One guard used a steel-toed boot to kick a piece of flesh out of Lt. Col. Berryman's leg, exposing the bone. A lit cigarette was then pressed several times against his forehead and then pressed against his nose and each ear. The cigarette was then crushed out in an open wound in his neck.

Once in Baghdad, Lt. Col. Berryman was thrown into a prison cell from which he could clearly hear other American POWs being beaten by Iraqis. These were among the worst sounds he remembered from his experience while a captive of Iraq, both because it was excruciating to hear a fellow human suffering and because he knew that it would soon be his turn to be beaten again. Indeed, his cell door soon opened and two Iraqis entered. The larger one kicked his left leg and punched him. After about five minutes of continuous beating, these Iraqis left his cell and moved on to the prisoner in the adjacent cell. This cycle repeated itself two more times. During the last session, Lt. Col. Berryman asked the Iraqis what they wanted. They replied simply and coldly that they wanted to kill him, and then they continued beating him. Lt. Col. Berryman feared for his life every moment he was held captive in Iraq.

The next day, he was taken to what the POWs referred to as the "Biltmore," where he was kept in solitary confinement in a six-by-ten-foot cell with almost no light and a non-functioning toilet. He was fed a starvation diet of two scoops of broth and two small pieces of pita bread each day. He was given only two thin blankets for protection against the freezing Baghdad nights. After several weeks, he began to lose feeling in his hands because of the severe cold. He lost 25 pounds during the thirty-seven days he was in Iraqi captivity.

The interrogations continued at the Biltmore. They varied in length from a few minutes to hours. On two occasions, he was forced to make videotaped statements. The beatings during these interrogations also continued. In addition to their fists, the guards often used instruments, includ-

ing rubber hoses, clubs, and pistol barrels. At one point, the interrogator placed a gun to Lt. Col. Berryman's head and told him that if he did not answer the remaining questions correctly, he would die.

At another interrogation session, his hands were held on the table in front of him. The interrogator stuck a knife between two of Lt. Col. Berryman's fingers and announced that he would have to answer five questions. He was told that for each answer deemed insufficient his interrogator would cut off a finger. Lt. Col. Berryman's fear at that point was so overwhelming that he was unable to answer any question. He was then told he would have a similar interrogation several days later.

He was spared that particular torture when the Biltmore was bombed by Allied forces. He was moved to a civilian prison, dubbed "Joliet" by the POWs, where he contracted dysentery that plagued him for years after his return to the United States and still continues to cause a number of problems.

Only after his release did he begin to receive appropriate medical attention for his broken leg and other injuries. Every day of his life, Lt. Col. Berryman thinks about the torture he experienced in Iraq. Nightmares about his time there continued for months after his return to the United States. He was grounded from flight status during this time. To this day, he cannot tolerate anyone touching his wrists because nerve damage from the handcuffs he wore has never fully healed.

As a result of his treatment in Iraq during his captivity, Lt. Col. Berryman developed PTSD. Although his symptoms have fluctuated, he continues to meet criteria for the full disorder. He also suffers symptoms of chronic depression including loss of pleasure, social withdrawal, and nihilistic feelings. These symptoms have seriously affected his family life. He is more withdrawn, more solitary, and less trustful now than before his torture by Iraq while held as a POW. This emotional shift inward caused a great strain to his marriage that he and his wife have resolved only with significant effort.

His POW experience had a negative impact on his career, causing a two-year delay in his promotion to Lieutenant Colonel. As a result, he earned $70,000 less than if he had been promoted on schedule, a loss attributable to the mistreatment he received while a POW.

### Former Sergeant Troy Dunlap

On February 27, 1991, then-Sergeant Troy Dunlap was on a search-and-rescue mission in a Blackhawk helicopter when it was shot down over Iraq. He survived the violent crash, along with U.S. Army Major Rhonda Cornum and U.S. Army Staff Sergeant Daniel Stamaris. Iraqi troops quickly captured him and Major Cornum, while abandoning the severely wounded Staff Sergeant Stamaris at the crash site. During his capture, the soldiers spit on him and kicked him while a guard said in English for the soldiers to "kill him." A soldier put the barrel of a gun to his head and pressed it into his skull. Slowly, he pulled the trigger until it clicked. After the click, his captors laughed loudly at his anguish. Then they started kicking and spitting on him again.

Dunlap was eventually taken to an underground bunker complex where he underwent his first interrogation. The interrogators, seeking details of his mission, pounded his head with a pistol whenever he gave answers they did not like. One of the men then threatened to harm to Major Cornum. During this interrogation, he was asked if he was Jewish.

He was later taken to a town where his guards allowed civilians to hit him and spit on him. One of the civilians spit in his face and grabbed his nose, pinching it until

the pain was unbearable. The guard then punched him in the teeth.

That night, Dunlap was locked in a small room tied to a chair with his hands bound behind his back. The only light was from a lantern the guards carried. The guards placed a fuel-soaked blanket over his body up to his neck and laughed as they lit matches and threw them around his chair. His tormentors left momentarily, then returned and placed what appeared to be dates on the blanket. Just as he was trying to devise a way to eat the dates without the use of his bound hands, the guards urinated on the dates.

The next day, Dunlap was taken to an abandoned office where he was left to be watched by a child around the age of ten or twelve who was told, "If he moves, kill him!" For the next three or four hours he stared at the wall, fearing the child would shoot him and claim that he had tried to escape.

He was then moved in a truck to another prison. During the trip, he was punched repeatedly in the stomach and slapped by the guards. When he arrived at what he believes was the prison the POWs called the Joliet, he was thrown into a cold, damp cell. The guards at the prison frequently kicked him and hit his head with their guns.

Dunlap was then taken to another prison where more interrogations took place. His cell there was even smaller than the one at Joliet. He was on a cold concrete floor, had no boots, and had to use a coffee can as a toilet. The guards often told him they needed his home address for the bombs they would send his family. The also said they would send him home one piece at a time.

During one of the interrogations, the guards put scorching hot spoons on the back of his neck each time they did not believe his answers. They threatened to cut off his fingers, and they kept telling him that they would hurt Major Cornum if he did not cooperate. During these interrogations, the guards repeatedly kicked him, hit his head with pistols and rifle butts, and threatened to kill him.

During his seven days in Iraqi captivity, Dunlap lost 18 pounds due to the starvation diet to which he was subjected. The unsanitary conditions he endured also resulted in intestinal problems, including dysentery.

Former Sergeant Dunlap continues to have nightmares—on average twice per week—about his torture in Iraq. His nightmares usually include Arabic shouting, gunfire and bright lights. He suffers from sleeplessness, a loss of patience, and flashbacks to his experience in Iraq. Shortly after his release, he felt a major change in himself. He was easily frightened and he became isolated.

He has been diagnosed with PTSD. Although he had been awarded the Bronze star with valor, the Purple Heart, and a POW medal, he was discharged from the Army in October 1992 because of a pattern of misconduct that was possibly a symptom of his PTSD. He was later divorced from his wife, who felt he had changed and who was afraid of him because of his nightmares. He continues to suffer from PTSD with severe impairment in his mood and interpersonal functioning.

### Colonel (Ret.) David Eberly

Col. David Eberly was shot down over northwest Iraq on January 19, 1991, and lost consciousness as he ejected. When he awoke, he and his crewmember headed for the Syrian border. As they approached an apparently deserted shack to seek shelter from the cold, they were captured by Iraqi soldiers who hit them repeatedly before throwing them into the back of a truck.

Col. Eberly was paraded through a small town and exposed to angry mobs.

Once, while handcuffed in the back seat of a small car, he was attacked by civilians waving sticks and trying to overturn the vehicle. One threw a grapefruit-sized rock through the window behind him.

In Baghdad, he was taken to a video studio and was hit in the head when he did not provide the answers about the war that his captors sought for propaganda purposes. The main interrogator demanded that he cooperate, putting a gun to his head and saying, "You answer my questions or you die, here." He pulled the trigger on an empty chamber.

On January 31, Col. Eberly was taken to the Biltmore, which he learned on return to the United States was the Iraqi Intelligence Headquarters. There he was thrown into an empty cell with no cot, no light, and no heat. He was forced to use a non-functioning toilet in his cell. He slept on the concrete floor with only one blanket for protection from the cold. His daily diet was generally one ladle of broth and a piece of pita bread, but on some days he received nothing. Water was rarely offered.

A second forced propaganda video session was held with Col. Eberly shivering and bleeding, and more interrogations followed. One of his captors' most frequent means of torture was to hit the side of his head, trying to burst an eardrum. During several other interrogations, guards held a pistol to his head and pulled the trigger. On another occasion, he was forced to undergo an inspection of his genitals. This caused him absolute terror, as he had heard of Iraqi mutilations of Iranian prisoners. As the ranking POW, however, he continued to plead for better treatment for the POWs, asking that they be given medical attention, water, food, and blankets.

On February 23, Allied forces bombed the Biltmore, and the POWs were moved to another prison. The conditions at the new prison were extremely unsanitary, resulting in severe gastro-intestinal problems for Col. Eberly.

At the time of his eventual release, his abdomen was sunken and the skin on his chest and legs hung in folds. During the forty-six days he spent in captivity, he lost approximately 45 pounds, over 31% of his body weight.

Col. Eberly's transition back to life as a free person was marked by his impatience to return to a productive leadership role at work. The transition was slow and disconcerting. He continues to suffer mental torment from his facial scars and the torture he endured as a prisoner in Iraq. He is less patient now than before his inhumane treatment and he avoids personal confrontations.

He suffers great continuing stress as his family members, especially his son, continue to cope with the trauma endured from his time as a POW. His wife sought psychological counseling and is still being treated for issues related to this experience. The lingering effects on his family have a negative impact on Col. Eberly's well being. His prognosis is guarded, and it is unclear how much of the psychological damage he has suffered can be mitigated, even with treatment.

*Lieutenant Colonel (Ret.) Jeffrey D. Fox*

On February 19, 1991, Lt. Col. Jeffrey Fox's A–10 aircraft was shot down over southern Iraq. He was injured during his ejection, including damage to his right arm, right knee, and compression fractures in his back. He immediately used his radio to call for rescue, but he was captured by Iraqi soldiers before help could arrive. He was taken to a room where he was blindfolded, handcuffed, and tied to a chair. His captors struck him, breaking his eardrum and knocking him to the floor. They continued to beat him with their hands and other instruments, ordering him not to yell in pain.

He was later transported, handcuffed and blindfolded, in the trunk of a vehicle. At this point, he had a torn knee ligament, a broken ear drum, and pain in his back, arms, and legs. After he was thrown into the trunk, he was hit on the head and legs. He was taken to an unknown location where he underwent a lengthy interrogation by several Iraqis in civilian attire. The interrogators accused him of being an Israeli fighter pilot and they conducted inspections to ascertain whether he was circumcised. In addition to the degrading nature of the inspections, this incident produced intense anxiety about being executed or more severely tortured.

Lt. Col. Fox was then taken to the Biltmore prison, where he suffered severe beatings and was informed that he was to be released to the people in the streets who would kill him with a knife. At the Biltmore, he was regularly beaten on his badly injured right knee, as well as on his legs and back. He sustained blows to his head and kicks to his legs and groin.

Lt. Col. Fox was kept in solitary confinement in a small concrete cell. He had to sleep on the floor by a broken toilet with only one blanket to protect him against the cold and damp. There were no lights and no access to water or a functioning toilet. Each day his captors fed him only a single ladle of thin red soup, sometimes with a piece of bread. He was given minimal drinking water. He spent his time in the corner of the cell with the blanket over him, and he prayed constantly.

During the interrogations, his Iraqi captors tried to force information out of him by hitting him on his face and body, sometimes with a fist and sometimes with a rubber mallet or baton. They kicked him with their military boots and hit his injured right knee.

The beatings were recurrent, at least once each day. During one interrogation and beating, while handcuffed and blindfolded, he was told that he would be shot. Someone cocked a pistol behind him. Finally, the gun was discharged next to his right ear, exploding his ear drum.

The Biltmore, a military target, was bombed on February 23, 1991 by Allied forces unaware of the presence of the POWs. Lt. Col. Fox was then transported to Joliet, the civilian prison. On his arrival, he was taken into a courtyard and made to sit cross-legged. Being forced to remain in that position was intensely painful. Sanitary conditions at Joliet were unfit for humans. Lacking a toilet, he would at times urinate in his boot and pour the urine out of a small window. The water he was given was very dirty and he contracted giardia. The combination of disease and starvation caused him to lose approximately 25 pounds while he was a POW in Iraq. During his fifteen days of captivity, he was purposely deprived of medical care.

At Joliet, he was beaten at least twice more. On one occasion, he was asked questions while being videotaped for propaganda purposes.

While he was held as a POW by Iraq, Lt. Col. Fox wanted to notify the United States government, and through them his family, that he was alive. He was never permitted to do so. The fact that his family probably did not know what had happened to him, and might think that he was dead, was a terrible emotional burden.

Throughout the duration of his captivity, his distress was constant, and he was concerned that a guard would finally do too much damage to him. It was particularly frightening to hear the guards' footsteps in the hall and think they were coming for him.

Following his return to the United States, his physical and psychological problems have persisted, some to the pres-

ent. He underwent surgery to repair the tympanic membrane damaged when the gun was fired next to his right ear, and he currently suffers from tinnitus, ringing, and some hearing loss.

The repeated kicks and beatings to his injured right knee caused him to require reconstructive surgery to his right anterior collateral ligament. Despite the surgery, and physical therapy over the years, his knee has never fully healed and he now needs a total knee replacement. He is regarded by the Veterans Administration as 40% disabled.

Lt. Col. Fox endured chronic diarrheal problems until at least April 1993 and has a low iron condition, both secondary to giardia. He has experienced pain in his shoulders and neck he attributes to being beaten there with the baton.

Following his release from Iraq, he noticed he had become unable to tolerate disagreement, especially in the workplace. The impatience caused by his experience as a POW had a negative impact on his career. He retired from the Air Force, was hired by Southwest Airlines, but soon quit. Subsequently, he worked in a number of jobs on a short-term basis. Currently, he would like to find a part-time job. He still suffers from Subthreshold Posttraumatic stress disorder caused by the mistreatment he suffered while he was a POW in Iraq.

*Chief Warrant Officer (Ret.) Guy Hunter*

On January 18, 1991, CWO Guy Hunter and his pilot, then-Lt. Col. Acree, were shot down. CWO Hunter received a concussion and lost consciousness, and Col. Acree ejected them both. They were captured by Iraqi soldiers within five minutes.

At his first interrogation, when CWO Hunter refused to disclose military information, the cloth ties on his hands were replaced with handcuffs, clamped so tightly that his hands began to swell and he was in agony.

At what he believed to be an Army headquarters in Kuwait, CWO Hunter was kicked, hit, and beaten with batons on his head, sides, legs, and stomach. At one point, he was forced to kneel, and he remembers vividly the sound of a sword being drawn from a scabbard, giving him the distinct impression that the Iraqi soldiers were preparing to behead him.

On the way to Baghdad, he was repeatedly beaten by the guards and was interrogated in an attempt to obtain military information. At this time, his handcuffs were so tight his hands swelled. He remained in handcuffs for about five days, with only brief breaks to use the bathroom.

On arrival in Baghdad, he was interrogated two or three more times and was beaten into unconsciousness. If he did not answer questions to his interrogators' satisfaction, they would put a gun to his head and pull the trigger in a mock execution. CWO Hunter underwent a total of four mock executions as a POW.

During other interrogations, he was forced to sit on the concrete with his back to a concrete wall, still blindfolded and handcuffed. He clearly heard moans and shrieks coming from other cells. The beatings continued and he remained tightly handcuffed. He was asked the same questions he had been asked before, but with increasing brutality. He felt the barrels of guns placed against his head and stuck in his mouth. He heard the trigger pull sounds and gun slides being recycled next to his ear. After being gang-beaten to unconsciousness so many times, he was forced to make statements about "peaceful Iraq" for a propaganda videotape to be broadcast on international television.

Eventually, CWO Hunter was taken to another prison in Baghdad. An Iraqi military officer told him that he would never go home. A feeling of deep despair swept

over him and he felt utterly isolated and alone. Most painful of all, he imagined his wife wondering day after day what had happened to him.

At the end of January, he was taken blindfolded and handcuffed to the Biltmore. He was asked several times if he was American, and at least twice he was beaten when he answered that he was. The interrogations were violent. He spent most of his time in prayer or thinking of his wife and children and hoping they would have a good life if he did not make it back alive.

His cell had a broken toilet and water was severely restricted. He endured a raging thirst and had difficulty swallowing the piece of bread he was occasionally given. The only other sustenance he received was a small amount of red and watery liquid. He lost approximately 30 pounds due to his starvation diet as a POW in Iraq.

The cell had a bare concrete floor and was constantly dark and cold. He developed running sores on his thighs and his tail bone from lying on the concrete day and night. He suffered from persistent aches and pains. His eyes became infected and his only available option was to use his hands to wipe the sores in his eyes and then to rub the pus on the walls of the cell. He never received medical help.

He often heard other prisoners being taken from their cells and then heard them screaming with pain as they were beaten. Hearing the thump of clubs hitting a prisoner's body and the resulting moans seemed to freeze his mind in a stupor.

During his forty-seven days in captivity, CWO Hunter had a constant fear of permanent injury. During the interrogations, the men would hit him in the back of his head when they did not like his answers. He was beaten into unconsciousness at least ten times during captivity.

On February 23, 1991, his captors threatened to cut off one of his fingers for each unsatisfactory answer he gave at the next day's interrogation. He fully believed his captors would follow through on that threat, but the Biltmore was bombed by Allied forces that night.

As he was transferred to Joliet, he was again beaten. It was very cold at Joliet and he had only one blanket. He shivered constantly.

The torture by Iraq has had serious lingering effects on the quality of his life. Following his release, CWO Hunter was easily frightened. His children became anxious around him and were occasionally frightened by his behavior and tenseness. He suffered with post-concussive syndrome caused by the many beatings to his head during captivity in Iraq. He has also suffered from tinnitus, some hearing loss, frequent and severe headaches, stiffness, swelling and pain in his hip and shoulder, dizziness, sleeplessness, night sweats, nervousness, and fatigue. He sustained permanent nerve damage from the severe handcuffing that still causes pain and numbness in both of his arms, from the elbow through his hands, and especially in his thumbs. At night, he tries to straighten his arms out to get relief, but the pain has not improved over time. The aches and pains, coupled with almost nightly nightmares, cause sleeplessness that leaves him constantly tired.

Today, he remains depressed. He takes Zoloft, but his nightmares still occur regularly. In addition, he is more irritable and has difficulty getting along with others. He is short with his family now and it hurts him that he could have been so changed by his POW experience.

CWO Hunter is currently suffering from PTSD and Alcohol Dependence caused by the mistreatment he suffered while he was a POW in Iraq. These disorders impaired

his ability to adjust to civilian life after retiring from the Marine Corps in 1994. His future course, even with treatment, is guarded.

### Sergeant David Lockett

Sergeant David Lockett was taken prisoner when his truck convoy ended up in the middle of the Iraqi Army. During his capture, he suffered a gunshot wound to the abdomen, with shards of metal lodged in his wound as well as in his chest and legs. Immediately after his capture, he was driven from camp to camp blindfolded and with his arms tied behind his back. At each camp, the soldiers would take turns hitting him on the knees with their weapons while spitting on him and laughing. When the soldiers noticed he had a gunshot wound in his abdomen, they punched him there with their fists and the butts of their weapons, making the bleeding more intense.

During his first interrogation, he was hit in his face when he did not provide requested military information. He was then tied to a chair while a number of Iraqis took turns hitting him with their fists and hitting his knees with their rifles and pistols.

Once while being transported to a new location, Sergeant Lockett grabbed one of the guards to prevent him from assaulting a female POW. The guard drew his pistol and pointed it at his head while another guard hit him on the knees with his rifle. He was threatened with death if he did not stop this effort to assist his fellow POW. When Sergeant Lockett released his grip on the guard, the guards smashed his knees with their rifle butts and tied his hands even tighter. During his transportation from Basra to Baghdad, the guards hit him every time he appeared to be falling asleep. Some slapped his face and head, some pounded his knees with their rifles, and some punched him in the open wound in his stomach.

In Baghdad, he was placed in a dirty cell with nothing to protect him from the cold. The next morning, guards held him down while they attempted to remove the bullet in his abdomen without anesthesia. The pain was so intense that he thought he would pass out. Unable to remove the bullet, the guards hit him in the abdomen and tossed him a bandage.

During interrogations, guards used the butts of their weapons to beat Sergeant Lockett's knees. His interrogators sought information about his family and, when they learned he was married and had children, they asked him for his home address. They threatened that if he did not reveal his home address, he would never see his wife and children again.

He requested unsuccessfully that the ICRC be permitted to inspect the POWs' conditions. He wanted someone to notify his family, including his mother and his children. He was particularly concerned that his mother would be devastated if she were forced to wonder what happened to him.[4]

He was forced to make a videotape to denounce the war effort. He was told that if he did not cooperate, he would be put in a building due to be hit by coalition forces.

During his captivity in Baghdad, he was fed a starvation diet of soup and bread. He lost 39 pounds during the thirty-three days he was held as a POW by Iraq. He developed severe diarrhea but was never allowed to clean himself.

Following his release, he had surgery to remove the bullet in his abdomen and the remaining metal scraps from his chest.

---

4. When he went to see his mother in a mental hospital after his release, she became violent toward him because she thought he was playing a trick on her to make her think her son was still alive.

He continues to experience joint pain, especially knee pains from the numerous beatings and damage the Iraqi soldiers inflicted with their rifle butts. He continues to suffer pain in his shoulders and lower back. He tires easily. He has been diagnosed with hyperthyroidism linked to his starvation in Iraq. While his normal weight is 190 pounds, this medical condition kept him from achieving a weight over 155 pounds for at least eight years after his captivity.

Sergeant Lockett used anger to help him survive the torture, but he has not been able to control this anger since his return from captivity. Ordinary obstacles or minor changes at work frequently send him into a rage. He reacted angrily to his children's typical youthful behavior and was distressed that he could not control himself. The strain created by the changes in his personality eventually led to separation and divorce from his wife. This post-torture anger has caused him to lose interest in progressing in the military and hindered his progress through the ranks.

Sergeant Lockett suffered from PTSD in the months following his return from Iraq. At present, he has significant residual symptoms related to his captivity including diminished interest in activities and foreshortened future orientation. Due to these psychological symptoms, he has experienced severe disruptions in his personal and professional life and continues to require treatment.

### Lieutenant Colonel H. Michael Roberts

Lt. Col. H. Michael Roberts's aircraft was shot down by a surface-to-air missile on January 19, 1991, and he was forced to eject just south of Baghdad. He was shot at by Iraqi forces during his parachute descent, and he was immediately captured when he landed. His captors took him to a nearby bunker and blindfolded him for an interrogation. Whenever he gave slow or unsatisfactory answers, his captors beat him with open hands, fists, and a club. His captors cut his head with repeated blows from their rifle butts and burst an eardrum with an open hand to the side of his head. They also shocked him with an electric prod on his neck, shoulders and back. This beating lasted all night.

Later interrogations followed the same violent pattern. In one, his captors beat his right leg repeatedly with a baton. His whole leg from the hip joint to the ankle became swollen and he was unable to walk without severe pain. Guards also shocked Lt. Col. Roberts on the neck, shoulders and back with the electrical device. The pain was intense and he could feel it throughout his body. It destroyed his will to resist. That night, while he was tied to a chair, an interrogator whispered to him, "You're a long, long way from Geneva now." The interrogator also threatened to take him outside and feed him to the wolves if he did not cooperate.

Whenever the Iraqi soldiers transferred him to a new location, they slammed their rifle butts to his head, beat him, and kicked him. On January 21, 1991, his captors tried to force him to make a videotape denouncing the United Nations war effort and praising "peaceful Iraq." One guard slammed the bolt shut on his rifle and pointed it at his head. The Iraqi in charge of the taping session threatened that the guard would shoot him if he did not cooperate. A long period of beatings followed. He still refused to make the tape, and his captors ordered a guard to take him outside and cut off his hand and leg. As he was led through the doorway, his captors knocked him to the ground and began kicking all exposed areas of his body. The leader used a baton to beat the back of Lt. Col. Roberts's head and neck until he finally agreed to be videotaped.

Subsequently, Lt. Col. Roberts was moved to the Biltmore. Abusive interro-

gations continued there. His cell and his treatment were similar to what other POWs at the Biltmore endured. He was convinced that if he were subjected to this treatment for more than a few weeks, he would likely die.

After the bombing of the Biltmore, Lt. Col. Roberts was moved to another prison, where he developed severe intestinal problems from giardia because of the unsanitary conditions. In his six weeks as a POW in Iraq, he lost 35 pounds.

Lt. Col. Roberts's wife was eight months pregnant when he was captured and he feared for her well-being. He was never offered a real opportunity to notify his family of his status, but an Iraqi soldier once tried to exploit the status of the Red Crescent by wearing a Red Crescent patch on his arm and asking for Lt. Col. Roberts's family's name and address. The soldier got angry when Lt. Col. Roberts refused to give any address other than his unit's air base in Spain, and he left without taking any address at all.

For several years following his captivity, Lt. Col. Roberts noticed lingering effects of the torture to which he was subjected in Iraq. These effects included waking up in the middle of the night with bouts of anxiety. Knowing of the pain his family endured during his captivity has also magnified his own post-captivity suffering. During repatriation, he developed PTSD symptoms which persisted until 1995.

*Lieutenant Colonel Russell Sanborn*

On February 9, 1991, Iraqi soldiers shot down Lt. Col. Russell Sanborn's single-seat aircraft over southern Kuwait. He was quickly taken prisoner by a group of Iraqi soldiers, who shot at his feet to see his reaction and to celebrate their victory of capturing him. He feared for his life because one errant shot from an over-agitated soldier easily could have killed him.

Lt. Col. Sanborn was taken to an underground bunker with his eyes blindfolded and his hands tied behind his back. He was then loaded onto a truck. As the truck careened down the road, he thought he was being taken to be killed in the desert. When the vehicle stopped, the guards grabbed him by his hair and arms and dragged him out of the truck. He was led into another underground bunker with a screaming crowd all around.

Inside the bunker, he was taken to what seemed to be a corridor with a large number of soldiers lining the walls on each side. He was pushed along this gauntlet of Iraqi troops, covered with a blanket so he could not see where the blows were coming from and with his hands tied so he could not protect himself. The soldiers beat him with a torrent of punches, kicks, and blows with hard objects that he assumed were rifle butts. The primary focus of the blows was his unprotected head. Each time one of the men knocked him to the floor, others kicked him viciously. Stunning blows were coming from every direction as he stumbled forward.

He finally reached the end of the hall where he was tossed into a room with five or six high-level uniformed military officers who threw him in the corner and removed the blanket from his head. He saw an apparently psychotic Iraqi soldier waiting to attack him. The soldier was being restrained, yelling and screaming. The Iraqi officers then released the man saying they were going to allow the man to tear Lt. Col. Sanborn apart. The man came at him in a flurry of arms and feet, punching and scratching. All he could do was curl up in a fetal position to protect his face and head. The man kicked him in the back of the head and in the kidneys while yelling and screaming. The Iraqi officers allowed the beating to continue for several minutes. Finally, the officers

pulled the man away and sent Lt. Col. Sanborn back through the gauntlet of soldiers for more blows to his head.

Lt. Col. Sanborn was pushed into a truck and driven to another bunker. At the second bunker, he was again made to face a gauntlet of cheering soldiers with a blanket over his head and his hands tied behind his back. The soldiers screamed and cheered as they connected with their rifle butts to his head, shoulders, neck, and back. They were not asking for information; they were simply torturing him.

He was forced to face a third gauntlet at the next bunker. By the end of the third gauntlet, he had given up any thought of surviving and just wanted the Iraqi soldiers to end it quickly.

He was next driven to a location where he was left on a cement floor for twelve hours awaiting transportation to Baghdad. Along the way, they stopped at five or six locations where Iraqis, who he assumed were checkpoint guards, punched him, kicked him, and spit on him. During the ride, one of the soldiers repeatedly rubbed the inside of Lt. Col. Sanborn's leg, as if to threaten a sexual assault.

When he arrived in Baghdad, he was put into solitary confinement in a dark, unsanitary cell. His bedding was only a thin foam pad with one tattered blanket. A bucket in the corner served as the toilet. At night, the temperature would drop dramatically and he would shiver throughout the night. The food and water were contaminated and he had constant diarrhea and vomiting fits throughout the day. He developed a rash on his groin and contracted internal parasites. His repeated requests to see a doctor were ignored.

It was at this prison, two days after he was shot down, that his captors first gave him food or water. His daily diet became a ladle of greasy water with particles floating in it. One meal consisted of water with a backbone from some animal floating in it. On this starvation diet, he lost 14 pounds in 26 days as a POW. Each day, it became more difficult to get up and walk around the cell.

During the violent interrogations at this prison, Lt. Col. Sanborn was forced to sit on a stool, blindfolded and with his hands tied behind his back. The guards told him they controlled everything about him and they beat him savagely. Whenever he failed to respond adequately during questioning, the guards took what seemed to be blackjacks and struck him with full swings. They threatened his life constantly. He felt them press their pistols and rifles to his head and repeat that they held the power of life or death over him and he must cooperate. During his interrogations, the guards beat his legs and back with a rubber hose. The beatings from the rubber hose were excruciating and left discolored welts that lingered for days and weeks. They also hit the sides of his head so hard that they knocked him off his stool, loosened his teeth, and broke his eardrums. After his eardrums were ruptured, he could no longer hear or understand his torturers' questions so he was taken back to his cell.

During the time Lt. Col. Sanborn was in this prison, the guards demanded that he stand whenever they entered. When he did not, they kicked him until he struggled to his feet. As part of the psychological torture, he was told that he would be executed as a criminal when the war was over.

As he lay on the floor of his cell, he thought of what his family must have been suffering emotionally, thinking he was perhaps dead. His worry was exacerbated when the Iraqi guards demanded to know his specific address in the United States, which he refused to give. He was afraid they could eventually locate his wife and

harm her, but he had no way to warn her of the potential danger.

When released from captivity, Lt. Col. Sanborn was taken to the hospital ship Mercy. He was diagnosed with an enzyme imbalance and parasitic anomalies and underwent numerous tests and treatments.

Today, his hearing has deteriorated substantially. It continues to worsen progressively as a result of the Iraqi interrogators bursting his eardrums in 1991. He now has trouble hearing normal conversational tones and has been informed by a doctor that he will probably need a hearing aid in the future.

He is currently experiencing posttraumatic symptoms, but they do not amount to a psychiatric disorder. He can usually put the past mistreatment by Iraq behind him if he does not dwell on the details. Indeed, writing his affidavit for this lawsuit was very difficult for him because it forced him to relive every blow, every kick, every threat, and the horror of every one of the twenty-six days he spent in Iraqi captivity.

Lt. Col. Sanborn continues to serve in the Marine Corps because he still wants to serve his country. In spite of having been a POW, he feels that he owes this duty to his family and to every American.

*Commander Lawrence Randolph Slade*

On January 22, 1991, Cmdr. Lawrence Slade's F–14 aircraft was hit by a surface-to-air missile and he ejected into Iraq. Following an effort at evasion, he was captured by a Bedouin tribesman and an Iraqi soldier armed with an AK–47 rifle. His captors pushed him to the ground with weapons pointed at him, blindfolded him, and bound his hands tightly behind his back. He was beaten, kicked, and forcibly thrown into a truck door, breaking his nose, breaking two teeth, and splitting both lips. He was taken to a bunker where he underwent violent interrogations. He remained blindfolded and handcuffed,

losing feeling in his arms and hands. His interrogators beat him with wooden bats or blackjacks all over his body from the neck down. Above the neck, they hit him with their fists and hands, breaking his nose a second time, breaking several more teeth, and rupturing his eardrums. When he was able to see his body days later, it was completely blue and purple from the beatings.

Cmdr. Slade was taken back to the bunker on several occasions for interrogations by Iraqi Intelligence Service personnel and the production of two coerced videotapes. On one occasion, his captors stuffed paper down his flight suit and set it on fire while he was cuffed and blindfolded. On another occasion, they unzipped his flight suit to examine his genitals. Because he could understand some basic Arabic from growing up in Lebanon, he knew that they were trying to determine if he was Jewish.

He was later taken to the Biltmore in Baghdad. Custody of the Allied prisoners was transferred from the Iraqi Army to the Iraqi Intelligence Service. Along with other prisoners, Cmdr. Slade was held here as a human shield in an attempt to prevent Allied bombing of this strategic target by coalition aircraft.

The conditions at the Biltmore were as forbidding as those previously described for the other POWs. He lost 45 pounds during his forty-three days of captivity on the starvation diet he was given, and he lost feeling in his hips because of the weight of his body pressing against the cold concrete when he slept. The numbness increased over time and eventually the feeling stopped returning during the day.

The interrogations at the Biltmore were conducted by officials in civilian dress rather than in Army uniforms. Physical violence continued during these interroga-

tions. One of his interrogators asked Cmdr. Slade if he wanted to say anything to his wife, Anna, before he died. Then he pulled the trigger on an empty pistol. This mock execution was accompanied by about twenty blows to the head. The combination of the assault and the mock execution instilled more fear in him than he had felt before. This mock execution procedure was repeated on him three more times.

After being transferred to Joliet, the civilian prison, three guards entered Cmdr. Slade's cell and severely beat and kicked him and his British cellmate, Lt. John Nichol, for fifteen to thirty minutes. This attack broke his seventh vertebra.

Cmdr. Slade also suffered torn pectoral muscles from the beatings by his captors. Absent proper medical attention, his broken vertebrae separated and improperly healed as two pieces. Twelve years later, he still cannot run or exercise for any length of time without experiencing pain between his shoulder blades from the injury. He continues to have abnormal liver functions, diagnosed as Gilbert's disease, which may have been caused or exacerbated by his starvation diet during captivity. He also has an undiagnosed condition in his upper intestines that causes bouts of incapacitating pain that may be caused by the scar tissue from repeated trauma to his abdominal region.

Following his release, he and his wife essentially began their marriage again. They deliberately postponed having children for several years following his release, to give them time to recover to some extent from the effects of his torture. Although he and Anna now have two daughters, the POW torture continues to touch their lives. His experiences as a POW and his need to encapsulate them so he could go on with his life have negatively affected his marriage. His wife remains terribly anxious during his overseas deployments.

He has been changed by the experience of torture and it has caused friction in his marriage. His marriage is strong and loving now, but that is in spite of the terrible experience his Iraqi torturers put him through.

Cmdr. Slade developed Subthreshold Posttraumatic stress disorder which resolved spontaneously within approximately one year without treatment. However, his tortured POW experience diminished his subsequent performance evaluations and damaged his military career.

### Major (Ret.) Joseph Small

Maj. Joseph Small's lightly-armed aircraft was hit by a surface-to-air missile over Kuwait on February 25, 1991. The missile killed his backseater on contact, but Maj. Small was able to eject safely. A dozen Iraqi infantrymen awaited his parachute landing and took him to an underground bunker.

At an Iraqi headquarters facility, he was forced to the floor in an awkward half-sitting, half-lying position that exacerbated the back and knee injuries he had sustained in his ejection. His wrists were swollen from the pressure of the tight constraints and he began to lose feeling in his hands. Several guards approached him from all sides and began hitting his head, especially targeting his ears. They whipped him with a strap and struck him on the back of his neck, knocking him unconscious. He was later taken outside to a latrine where he was asked whether he was Christian or Jewish and was examined to see if he was circumcised.

Guards drove Maj. Small to Basra and then to Baghdad, frequently beating him and threatening to kill him. The awkward seating position he was forced to assume tore a rotator cuff in his left shoulder. During an interrogation in Baghdad, he was threatened with execution. The cloth bindings on his wrists were replaced by

handcuffs, which were ratcheted down as tightly as possible. Guards fondled his genitals, apparently again to check if he were circumcised. They caused him to fall down stairways twice.

Maj. Small was later taken to a prison just outside Baghdad. In this prison, he was given only a thin blanket and very little food. Iraq held him as a human shield, and at no time during his approximately one week of captivity was the ICRC notified that he was being held as a POW, nor was he ever offered a chance to fill out a "capture card."

Upon returning to the United States, Maj. Small's readjustment with his family was not easy. He was jumpy and on edge. He knew that his wife and children had been through a very traumatic experience, and he had a difficult time dealing with that along with his own difficult experience. He began to build an emotional wall between himself and his family. He suffered from nightmares during his first months home, and he had many "flashbacks" while wide awake which were so real they frightened him. Maj. Small describes himself as a person with a "short fuse." Prior to his experience, he was an even-tempered, patient person. He now feels withdrawn, and in many respects depressed. Although he has great love for his family, he is unable to express it. He has become short-tempered with his wife and children. He feels alone and withdrawn even in a small group of friends or coworkers.

He continues to be uneasy around loud noises. A car's backfire or other sudden noise will startle him to the point of distress. He continues to have night sweats and to run fevers during stressful times. These changes in him are attributable to his torture, including the conditions of his confinement. He developed PTSD and still suffers from the disorder, resulting in moderate to severe impairment in his family life and social functioning.

### Staff Sergeant (Ret.) Daniel Stamaris

While on a search-and-rescue mission on February 27, 1991, Staff Sergeant Daniel Stamaris's helicopter was shot down, killing five of the eight crew members. He was seriously injured, suffering a broken left foot, a double dislocated left foot, a broken left ankle, tibia, and fibula, a compound fracture and a shattered left femur, a torn posterior cruciate ligament in his knee, a broken and separated pelvis, several broken ribs, and bruised internal organs. Instead of giving him medical care for his injuries, Iraqi soldiers stripped him of his survival and first aid equipment and threw his dog tags into the sand. The soldiers told him he was going to die and then left him to do just that. Several hours later, members of the Republican Guard arrived at the crash site, put him on a tarp and tossed his body onto a truck. The excruciating pain caused him to scream.

During interrogations throughout the next few days, his captors threatened to castrate him if he did not answer their questions. He was never given medical care. Drivers moved him around like baggage, despite his extensive injuries. They also allowed civilians to beat him. He was repeatedly left outside to die, and he believed he might be killed by the wild dogs he could hear in the distance. Guards threatened to kill him and to cut off his leg. He lost approximately thirty pounds due to the malnutrition, lack of appropriate medical attention, and lingering injuries, which had been exacerbated by the abuse he endured. Meanwhile, Iraq let no one know of Staff Sergeant Stamaris's status as a POW and did not allow him to notify his family.

Although Staff Sergeant Stamaris's seven-day period in captivity was relatively

brief, he could have died at any time while he was a POW because his femur was shattered and there were bone fragments within a millimeter or two of his main femoral artery. With the total disregard that the Iraqis showed toward his injuries, such as throwing him around and dumping him on the side of the road, these bone fragments could have shifted at any time and severed his main femoral artery, causing him to bleed quickly to death.

Six months after his release, Staff Sergeant Stamaris was able to work two hours per day while still convalescing. He had to undergo physical therapy for about a year. Continuing physical effects include decreased mobility and intermittent pain throughout his left leg, hip, and pelvis. Chronic lower back pain makes it difficult for him to sleep. His initially untreated left leg is now about 1 ½ inches shorter than his right leg. He has endured multiple painful surgeries to address these problems with only limited success. He also believes that his earnings power has been depleted due to his restricted mobility.

As the result of the mistreatment he received in Iraq in the first 24 hours after his helicopter crashed, Staff Sergeant Stamaris developed Posttraumatic Stress Disorder which resulted in severe impairment in his personal life during the years 1991 to 1996. Symptoms of PTSD persisted in 1997 to 1998 leading to moderate impairment. He currently experiences occasional intrusive memories of his ordeal resulting in mild impairment.

*Lieutenant Colonel Richard Dale Storr*

On February 2, 1991, Lt. Col. Dale Storr's plane was hit by Iraqi ground fire and he was forced to eject. His wingman neither received his radio calls nor saw him eject. Additionally, because Lt. Col. Storr's parachute descent took him through the fireball caused by his exploding aircraft, his wingman failed to observe the parachute and feared that Lt. Col. Storr had been killed.

Lt. Col. Storr was immediately surrounded by Iraqi forces who slapped, beat, and kicked him. These beatings, occurring so soon after he ejected and parachuted through a fireball, were very disorienting and especially painful. As he was marched back to a truck, his captors hit him on the back of the head with a rifle butt, knocking him to the ground. They then threw him onto the truck bed.

During and between interrogations he was violently beaten, kicked in the head, urinated on, and sent tumbling downstairs. He was forced to walk though mobs of angry Iraqis who slapped, kicked, and punched him. His interrogators demanded strategic and personal information, and he was beaten for refusing to answer to their satisfaction. During certain interrogations, guards shocked him with an electrical device when he gave inadequate answers. They struck him so hard he fell off his stool. They beat him with clubs, broke his nose, dislocated his shoulder, and burst his left eardrum. While trying to rise from the floor, he vomited from the pain but they continued to torture him. Ultimately, the pain from his dislocated shoulder and broken nose, as well as the nausea, vomiting and diarrhea became nearly unbearable, and he hoped he would die to end the agony. The guards continued to beat him, both during interrogations in an attempt to extract information, and between interrogations simply gratuitously. At one point, Lt. Col. Storr was blindfolded, handcuffed, and placed execution-style against a wall where he was videotaped by an Iraqi news crew.

Lt. Col. Storr was inspected to see if he was circumcised, apparently based on his captors' desire to determine whether he was an Israeli. He was also questioned in

Hebrew to see if he understood and responded to that language.

At the Biltmore, the regional headquarters of the Iraqi Intelligence Service, Lt. Col. Storr was held in a small cell with a foul, non-functioning toilet. He was placed on a starvation diet of one ladle of greasy water per day, sometimes with a piece of bread. He was given only minimal drinking water. He lost 37 pounds while held for thirty-three days in Iraq and would likely have died if the war had lasted much longer. His cell was so cold at night that he would lose feeling in his feet and he had to rub them vigorously to get the blood to flow. He did not recover feeling in his feet until six months after his return to the United States, and some numbness continues today.

Iraqis continued to interrogate Lt. Col. Storr. They asked him to identify five methods they could use to protect their tanks from Allied missiles and told him they would cut off one finger for each method he failed to disclose. On another occasion, when the interrogators discovered that Lt. Col. Storr had been answering their questions untruthfully, guards beat him severely and said they would execute him. Only the February 23 bombing of the Biltmore, where he was held as a human shield, disrupted these plans.[5]

Psychological violence continued for him as well. His captors regularly chained an Iraqi prisoner to the door next to his and beat the prisoner severely. His screams would go on for hours after these beatings with absolutely no sympathy from the guards. Lt. Col. Storr was told that the other American POWs were all being killed. Hearing a volley of small arms fire outside his window each morning led him to believe that executions were being carried out. Recognizing that it would be much more painful to Lt. Col. Storr than any physical torture, the Iraqi captors had previously told him falsely that his wingman had been shot down and killed trying to help him after the crash. He suffered greatly believing erroneously that his wingman, for whom he felt ultimately responsible, had died trying to save him.

After the destruction of the Biltmore, he was taken with other POWs to Joliet, the civilian prison. He became extremely sick with giardia due to the unsanitary conditions there. The guards did not let him use a bathroom to clean up the vomiting and diarrhea, and he was beaten for asking to use one. He was forced to use the corner of his cell as a toilet, and his requests for cleaning supplies were refused. Lt. Col. Storr has never forgotten the stench and squalor of being forced to live in his own excrement.

Iraq never notified the ICRC or any other organization of Lt. Col. Storr's status as a POW. He agonized over the experience his family, particularly his mother, must have been going through. He learned from another POW that he was reported to have been killed and that his unit had held a memorial service for him.

To this day, he continues to have nightmares about his torture in Iraq. These nightmares occurred almost every day during the first few months after his release but have since faded to two or three times per month. Lt. Col. Storr thinks about his torture every day but is proud that he conducted himself honorably while in captivity and that his Iraqi captors failed to break him. Knowing the pain his family endured has magnified his own post-captivity suffering. His mother subsequently passed away, and he believes that her worry over his experience acceler-

---

**5.** The bombing of the Biltmore, while probably saving his life, almost cost Lt. Col. Storr his life. The ceiling and walls of his cell collapsed on him and only a large steel grate that fell over him prevented the larger pieces of rubble from crushing him.

ated her illness. He expresses deep regret for putting his family and friends through anguish while he was a POW, apparently failing to recognize that it was not he but the Iraqi regime that hid his status as a POW and caused his family and friends to suffer.

Lt. Col. Storr developed several symptoms of PTSD which persist to the present, but his overall impairment is minimal. He is employed as a pilot by a major airline and continues to serve his country as an officer in the Washington Air National Guard.

### Major Robert Sweet

On February 15, 1991, a surface-to-air missile struck Maj. Robert Sweet's plane, and he was forced to eject in Iraq. He parachuted down over approximately fifty Iraqi soldiers and a battle tank. Immediately upon his landing, soldiers descended on him, beating him with their fists, kicking him, and striking him with their rifle butts. The mob behavior caused him to believe that he could be killed.

During initial interrogations, he was threatened and spit upon. He was paraded around the city streets and forced to endure physical and verbal abuse. After being turned over to the Iraqi Intelligence Service, he was threatened with being stabbed in the stomach. His handcuffs were clamped so tightly that they cut off the circulation to his hands. He was pistol-whipped at the top of a staircase, causing him to fall down the flight of stairs into a basement area. He was beaten with a rubber hose on his legs and torso, causing extreme pain. He was placed in a chair and beaten again until he fell out of the chair. He was clubbed for what seemed like hours. The pounding on his left side was so intense that he was left entirely black and blue, and for a week he was unable to lie down except on his right side. He was interrogated at length and threat-

ened repeatedly with death unless he provided useful information.

He was locked in solitary confinement in a dirty, eight-by-twelve foot cell, with no heat and often in total darkness. The toilet was broken and unsanitary. He had only a thin blanket to protect him from the freezing cold nights. For food, he was given a bowl of greasy, brownish-red broth, a piece of pita bread, and a cup of water once a day. He lost 10% of his body weight on this forced starvation diet. The inadequate water ration during his nineteen days in captivity caused severe dehydration.

The cycle of torture and interrogation continued. In questioning him about his mission and other military information relevant to the coalition, the guards battered his head and body with their fists. A gun was placed against the side of his head and he was ordered to reveal who carried out a particular bombing mission. He thought he would be shot. On yet another occasion, he was faced with execution as a pistol was placed to his head and he was informed that he was to be shot. He was placed in front of a camera and told to give useful information or be killed.

In subsequent interrogations, he was battered by fists, kicked, and hit with gun butts and other instruments, as his interrogators demanded military information. During one of these torture sessions, a guard approached him from behind, cupped his hands, and hit his ears to burst his eardrums, leaving him with a tympanic membrane perforation. He could no longer hear out of his left ear for the duration of his captivity. At one point, he was accused of being a Central Intelligence Agency spy and told that he would not receive Geneva Convention protections. On another occasion, he was told that the President of the United States had been

assassinated and that the First Lady had been injured.

While held in the Iraqi Intelligence Service headquarters, a lawful military target, he was exposed to coalition bombing. Later, he was moved to another prison, being hit again along the way. On his first day at the new prison, he was forced to sit all day with his legs cramped under him. When he tried to move or reposition his legs, he was hit with a stick. This caused nerve damage to his feet.

The conditions at this second prison were vile, with the only source of water a dirty trash can. The food was contaminated or not cooked and gave him several intestinal diseases, including giardia and salmonella. This magnified the problems he was already experiencing from his grave loss of weight and strength. At the new prison, he was interrogated and his life was threatened.

Despite repeated requests to be allowed to notify the United States Government of his status so that his family would know that he was a POW, he was not allowed to do so. Instead, his captors used hints at family notification as an inducement for cooperation. Maj. Sweet was offered a call home to his family if he would betray his country, but he refused. He suffered from thinking about how his family, especially his mother, would be suffering from the uncertainty of his status.

After returning from captivity, he experienced only limited use of his left ear for months. He suffered from nightmares and anxiety directly attributable to his torture. Further, he has had repeated problems with his back and neck for more than a decade. Maj. Sweet is still experiencing posttraumatic symptoms caused by his experiences as a POW in Iraq.

*Lieutenant Colonel (Ret.) Jeffrey Tice*

On January 19, 1991, Lt. Col. Jeffrey Tice's F–16 aircraft was struck by a surface-to-air missile over Baghdad. He flew for nearly 100 miles toward safety in Saudi Arabia before he was forced to eject over Iraqi territory. Within thirty seconds of landing, he was surrounded by Bedouin tribesmen, kneed in the groin, and struck with a rifle butt in the back of his neck. That night he was taken to their camp where they took turns punching, kicking, or threatening him with knives. In addition, he was forced to hold a gun to his head and play Russian roulette. The next day, he was bound and taken to a nearby town to await interrogators.

Three men interrogated him, and he responded to their questions with name, rank, and serial number only. They handcuffed him behind his back, picked him up by his elbows, and dragged him to an unmarked car for the drive to Baghdad. Each time he moved, the handcuffs tightened and dug deeper into his skin.

In Baghdad, he was taken to a room inside a building on an Iraqi military compound and thrown to the floor. After a few minutes, he was shoved, still blindfolded, down several flights of stairs into an underground bunker. Initially, he was placed in a hallway in the bunker where passing Iraqis kicked him, slapped him, and spit on him. He was then transferred to an interrogation room and chained to a chair. Over the next two or three days, he was interrogated around the clock in sessions lasting approximately thirty minutes, interspersed with thirty-minute breaks. Because of his rank, his interrogators pressed him for significant strategic information.

His interrogators beat him, generally in the lower extremities, focusing on his left leg and knee, and struck him all over his body with whatever objects they had at hand. At one point, he was struck with a wooden plank that shattered and almost broke his lower left leg. In addition to the pain from the beatings, he had completely

lost circulation in his hands after approximately twelve to fourteen hours of being tightly handcuffed. Lt. Col. Tice was beaten almost to the point of unconsciousness several times during these interrogation sessions. After the first day of torture, he was already badly bruised.

Voicing suspicions that he might be Israeli, his captors stripped him naked below the waist to check for circumcision. His penis was fondled and he was verbally abused during this inspection. His interrogators then accused him of being an Israeli spy.

As he continued to resist his captors' requests for information, the beatings became particularly fierce. He soon realized that his interrogators were beating him primarily on his lower body because they wanted him to make a videotape denouncing the United Nations' "invasion" of Iraq. He flatly refused and the interrogators became still more violent. Someone hit him, full force, with a semi-soft object in the left side of his head. This blow ruptured his eardrum, and he immediately felt blood running down his face. The interrogator began yelling that they could kill him and "feed his body to the dogs" and no one would know. He continued to refuse to make the video and they beat him again. One of the guards put a pistol to his head and pulled the slide back as the interrogator told Lt. Col. Tice that he would make the videotape or be shot. He refused. This enraged the guard, who hit him with the butt of his pistol on the side of his head, dislocating his jaw. The Iraqi captors dragged Lt. Col. Tice into the hallway where he put his face against the wall and forced his jaw back into a less painful position. After this brief respite, his captors dragged him back into the torture cell and chained him to the chair. His interrogators continued to press for the videotape. When he continued to refuse, one of them hit him and again dislocated his jaw.

At that point, one of the Iraqi guards tied a wire from Lt. Col. Tice's right ear, under his chin, to his left ear, to a battery, and turned on the electricity. The resulting shock forced every muscle in his body violently to contract at once. This caused his jaw to seize, his face to contort, and it forced his head to his chest and his knees to his head. Lt. Col. Tice called this torture device the "Talkman." As they repeatedly applied the shock treatment, it slammed his jaws together with enough force to crack his teeth. He was electrocuted perhaps ten or twelve times over the next twenty or thirty minutes.

He continued to refuse to participate in the video and a handgun was put to his head. The guard then struck him with the flat of the gun. Then the "Talkman" was hooked up and activated again. Eventually, he agreed to make the video to send a message to his wife and children, but he viewed this as the lowest point physically and psychologically of his captivity.

Because his jaw was still dislocated and several of his teeth were broken, he had great difficulty eating the meager rations he was given each day. He could not hear well because both of his eardrums were damaged. While in Iraq, he never received any medical attention. Instead, he was violently interrogated every night and given regular "maintenance" beatings that focused on his existing injuries.

Lt. Col. Tice was later moved to the Biltmore. He was kept in solitary confinement in a small cell with almost no light and a non-functioning toilet. He was given only two thin blankets to use in his cell that was always cold because it was covered in ceramic tiles on all sides. He was always cold and spent most of the time in his cell trying to keep warm.

When given food, it was always in very small amounts. His daily ration consisted of a few ounces of red liquid, which he

believed was the water the guards' meat had been boiled in. At one point, he went without water for three days. The limited water he received often smelled like diesel fuel.

Lt. Col. Tice was interrogated approximately ten times during his three-week incarceration at the Biltmore. The interrogators focused on obtaining information that would help them stop the coalition air campaign. During these interrogation sessions, he was told that he would never be allowed to go home and his interrogator hinted that he would be tried as a war criminal.

On another occasion, he was removed from the Biltmore, crudely shaven with a dull razor, then taken to a basement level television studio and put on the stage of what looked like an Iraqi talk show. When he refused to voice the statements they wanted, he was removed from the stage, thrown to the ground, kicked in the groin, punched, and hit in the head, shoulders, and ankles with a club and rifle butts. He continued to refuse and was thrown back into his cell when they realized he was no longer presentable for the camera.

After the destruction of the Biltmore in the bombing raid by Allied forces, Lt. Col. Tice was transferred to Joliet. During the drive to the new prison, a guard struck him between the shoulder blades with the butt of his rifle, partially dislocating his right shoulder and knocking him to the ground.

At Joliet, he was forced to kneel in the courtyard, blindfolded and handcuffed. He was afraid he might be summarily executed. He was forced to stay in the kneeling position for three or four hours. Each time he tried to move, a guard struck him across the shoulders with a baton.

He was then thrown into an eight-by-ten cell with a British airman. There was no toilet in their cell, and they were allowed out only once per day to relieve themselves. They were also fed only once per day. The food consisted mainly of broth and small amounts of leafy vegetables. His dehydrated state forced him to ingest any available water. Because most of the water he was given here was contaminated, he was quickly afflicted with intestinal parasites. The resulting dysentery caused him great distress and pain.

Although Lt. Col. Tice was in captivity for over six weeks, Iraq never released his name as a POW, even after Iraq was forced to account for the POWs as part of the ceasefire. Even after the first group of POWs was released on March 5, Lt. Col. Tice's family suffered great mental stress because they still had no idea what had happened to him. Knowing of the pain the Iraqi regime caused his family to endure has added to Lt. Col. Tice's own post-captivity distress.

Upon his release, Lt. Col. Tice was flown to Bahrain and examined and treated aboard the USNS Mercy for diarrhea, possible spinal injury, jaw dislocation, rib contusion, malnutrition, perforated left tympanic membrane, compression injures to his hands, and dental trauma. After he returned to the United States, he was admitted to Malcolm Grow Medical Center at Andrews Air Force Base for further treatment for his injuries.

He continued to have nightmares for months following his release. His nightmares were replays of his electric shock torture. Additionally, he was sensitive to loud noises. His body stored as fat almost any food he ate, and it took him nearly two years to regain his normal body mass and fat/muscle ratio.

To this day, Lt. Col. Tice suffers from lasting nerve damage to his hands from the handcuffs being clamped so tightly on his wrists. He also has muscle and nerve damage below his left shoulder blade

which is related to the beatings he received. He suffers from temporal mandibular joint syndrome, a condition related to the multiple dislocations of his jaw.

Lt. Col. Tice experienced several symptoms of PTSD early in his repatriation as the result of his captivity and the treatment he received in Iraq, including nightmares and flashbacks, hyper-arousal responses such as increased startle, and poor sleep. Currently, he is functioning well with occasional nightmares and flashbacks related to the torture he received.

### Lieutenant (Ret.) Robert Wetzel

Lt. Robert Wetzel was seriously injured when his aircraft was shot down in southwest Iraq on January 17, 1991, the first day of the Gulf War. Because of his knowledge of the torture practiced by Iraq, he contemplated shooting himself to keep from falling into the hands of Saddam Hussein. He realized, though, that his navigator might also be alive and need help. He called out for Lt. Zaun and, after they located each other, they began to walk toward Jordan until they were captured by Iraqi soldiers.

After he was captured, Lt. Wetzel received no treatment for his broken collarbone, broken vertebrae, and broken left arm. Surgery performed on his broken right arm was so inadequate that he had to keep his arm immobile during his captivity because he felt a grinding sensation in his shoulder with any movement. During this period of "medical treatment," he was interrogated in front of a video camera and was taken to a TV studio, dressed in a military flight suit and questioned in front of the cameras, apparently for propaganda tapes.

Later, he was taken to the Iraqi Intelligence Service Regional Headquarters where he was kept in solitary confinement. He was fed only once per day on a starvation diet of soup and bread that caused him to lose 25 pounds during his approximately forty-six days of captivity. He endured freezing temperatures night after night. He was kept in a cell that had no functioning toilet, had no bed or furniture, and had a cockroach infestation. At night, an Iraqi radio station was played over loud speakers to disrupt the sleep of the POWs and further disorient them. His cell was infested with lice, causing him to scratch his entire body uncontrollably. The contaminated water he drank gave him giardia, which caused diarrhea and further exacerbated the anemic symptoms he was suffering because of his starvation. On many occasions, he heard the guards pull other prisoners out of their cells at night and beat them severely.

During interrogations, he was blindfolded and whipped with a leather whip. Preying on the injuries he suffered when his aircraft was shot down, his captors whipped him principally over his broken arms, shoulders, back, and legs. His arms and hands were so numb from the whipping that he did not even feel the burn of a lighted cigarette a guard placed against his skin. The side of his head was also whipped with what he believed to be some kind of beaded instrument. In another interrogation, the four or five men in the room took turns hitting him on the side of his face. They threatened to break his left arm if he did not answer their questions, not knowing that it was already broken. On another occasion, he was taken to the interrogation room and inspected to determine if he was circumcised, apparently to see if he was Jewish.

When the Intelligence Service Regional Headquarters was bombed on the night of February 23, he was subjected to the terrifying bombing and was left in his cell overnight, as the Iraqi captors fled in fear of another attack.

Lt. Wetzel lived in fear of the Iraqi torture and in constant misery from his

injuries and the inhumane conditions of his captivity. He was never permitted to write to his family or to notify anyone of his captivity and condition. During his captivity, he anguished over his parents and siblings and his fiancée, Jacqui. Their wedding, planned for March 2, was postponed until after his release and after he had an opportunity to recover from the immediate effects of his torture.

After his eventual release, Lt. Wetzel spent thirty days in the Bethesda Medical Center receiving treatment for his severe injuries. The absence of proper medical treatment during his captivity, coupled with his starvation diet and other brutal conditions, resulted in only minimal healing of any of his broken bones. Because his right arm and shoulder had been immobilized so long during captivity, his muscles atrophied and his ligaments and tendons tightened. This significantly reduced his range of motion. When he moves his arm, his entire shoulder moves in an unnatural way. This is a constant source of pain when he uses his shoulder. His left arm also becomes sore whenever he uses it. He fears that the pain he suffers will get worse with age. As the result of his Iraqi captivity and torture, Lt. Wetzel developed mild PTSD symptoms, including increased irritability and loss of patience at home.

### Commander (USNR) Jeffrey Zaun

On the first day of the war, then-Lt. Zaun and Lt. Wetzel were shot down in western Iraq. Upon his capture, he was roughly forced into the back seat of a truck, blindfolded and handcuffed, and driven to Baghdad. At one point during the trip, he was led to believe that someone would cut his throat.

As his first interrogation began, his blindfold was secured so tightly that his eyes throbbed. His captors then cuffed his hands behind his back without engaging the holding mechanism, making the handcuffs tighten with each movement. This caused a painful loss of circulation in his hands, which remained numb for the next two weeks. During subsequent interrogations, the interrogators asked him tactical questions about his mission and the location of Allied forces. When he refused to provide the requested information, one of the men repeatedly karate chopped Cmdr. Zaun in the throat and struck him across the face.

At one point during an early interrogation, his flight suit was unzipped to inspect his genitals to determine whether he had been circumcised. He believed his interrogators were checking to see if he was Jewish.

He remained handcuffed and blindfolded and was left to lie in a bunker hallway for several days. Periodically, he would be taken to a room for interrogation. During one of his interrogation sessions, his tormentors brandished a pistol, accused him of crimes against the Iraqi people, and said they were going to kill him unless he made a videotape denouncing the coalition effort. Although he was tormented by being forced to make a video, he believed that making the video was the only way he might survive. He also thought that the tape might give notice to his family that he was being held as a POW. His shame and embarrassment about having made this coerced tape has been central to much agony and friction in relationships even with his loved ones who are unable to understand his feelings.

On January 31, 1991, Cmdr. Zaun was taken to the Biltmore in Baghdad where he was thrown into a tiny cell. He could not see the walls of his cell because it was so dark, and the sensory deprivation of weeks in this cell was excruciating. He was given small blankets to shield him from the extreme cold, but he still shivered every moment he was in this location.

He finally received food on the third day and was thereafter fed once each day with a cup of broth and two pieces of pita bread. His systematic starvation while in Iraq produced a weight loss of 30 pounds during his forty-six days of captivity.

During his captivity at the Biltmore, his captors sought to compel information about flight strategy and capabilities, and he was often hit in the face when he gave unsatisfactory answers. He was also subjected to two mock executions and several death threats which put him in great distress, as did hearing a nearby Iraqi prisoner being beaten. The guards at the Biltmore taunted him by stating that his mother must be very upset at his condition as a POW. This was terrible psychological torture for him.

When the Biltmore was bombed by coalition aircraft, he was able to escape from the cell and he tried to free his fellow POWs. When he was recaptured by the guards, they hit him in the face until he lost consciousness.

When Cmdr. Zaun was later transported to another prison, the guards again used handcuffs without the locking mechanism engaged, causing numb thumbs for weeks because of the loss of circulation and nerve compression. Additionally, one of the guards on this trip made a gesture suggesting that Cmdr. Zaun was going to be raped.

Cmdr. Zaun developed intestinal problems, which resulted in vomiting and diarrhea. There was no drain or toilet in his cell, and extremely unsanitary conditions persisted.

On his release from captivity, Cmdr. Zaun was diagnosed with stomach worms and told that he had a fractured shoulder. He had lingering fears for several months after his return. He was diagnosed with insomnia. He remains deeply affected by having been forced to make the videotaped statement that was broadcast internationally.

Cmdr. Zaun is aware that his parents suffered a great deal during his captivity, and he believes that the experience of torture has affected his relationship with his father. He also believes that the media attention that resulted from the forced video affected his career status in the military. As a result, he left active duty in 1998. He is now a Commander in the United States Navy Reserve.

As a result of the treatment that he received during his captivity in Iraq, he developed symptoms of PTSD including intrusive thoughts about death, anxiety, and difficulty sleeping. His symptoms persisted for several months after repatriation but then subsided. He is no longer symptomatic.

### B. *Family Member Plaintiffs*

The family member plaintiffs in this case suffered extreme emotional distress during the period of their loved ones' captivity. They all worried about the safety of their loved ones and reasonably feared that their loved ones would be subjected to brutal torture. This fear was based on the family members' knowledge of Saddam Hussein's reputation for barbarous treatment of prisoners in prior conflicts, reports out of Baghdad that POWs were being beaten and killed, and the televised images of obviously beaten POWs. Iraq's noncompliance with internationally-accepted standards for the treatment of POWs extended to its threats to use the POWs as human shields, an intent broadcast on Radio Baghdad and well known to the family members of the POWs. Iraq's persistent refusal to release information on the status of the POWs to the ICRC had a direct impact on the POWs' families.

The family members' suffering did not end with the release of the POWs. Each

had to endure the pain of seeing the altered condition of loved ones upon release. The POWs had not only suffered great physical abuse but also great psychological abuse, and many returned as different men, forever changed by their treatment by Iraq. Some changes caused by starvation diets and beatings were immediately apparent. Changes in the POWs' personalities soon became apparent. Many of these physical and psychological effects continued beyond the short term.

The lingering effects continue to plague both the POWs and their family members. While the family member plaintiffs remain close to their loved ones who suffered so deeply at the hands of Saddam Hussein and his regime, they have been gravely affected by the torture endured by the POWs. Many have movingly testified about how, after twelve long years, they are still waiting for their "real" husband, father, son, or brother to return. Their testimony is supported by evidence submitted by plaintiffs' medical experts.

*Spouses*

The suffering of the POWs' spouses was especially great. During the period of captivity, they did not know from one minute to the next whether their husbands were alive or dead. They were acutely aware that their husbands were probably being tortured. They were torn by the desire to take some action to try to help and the fear that anything they said or did could be used by Iraq to torment their husbands. Iraq's withholding information about the conditions of their husbands weighed heavily on them.

Moreover, the spouses suffered perhaps the greatest anguish over the altered conditions of their husbands upon their eventual release. Without minimizing in any way the intense suffering endured by the POWs' wives during their husbands' captivity, the suffering the wives have endured following repatriation is both overwhelming and long-lasting. Many have testified eloquently about the fact that their husbands were not the same men as the ones they had married, but the spouses have continued to love the husbands who returned to them following their release from captivity. Indeed, as poignantly stated by one spouse: "How can we not love any of [the POWs] that actually did daily mental and physical combat in a way that none of us will ever realize?" Leigh Berryman Aff. ¶ 12.

All of the spouses have had to live with their husbands' ongoing physical and psychological problems. In the words of one spouse: "One of the sad lessons I've learned is that time does not heal all wounds" and "[e]ven today, not a day goes by where I do not feel the burden of his experience." Cynthia Acree Aff. ¶¶ 51, 57. The testimony of the other spouses is similar in tone and substance. All suffered, and continue to suffer, greatly as a result of their husbands' ordeal. Some or all suffer from secondary trauma, depression, anxiety, and hopelessness resulting in severe disruption in marital and interpersonal functioning.

*Children*

The children, too, were dramatically affected. They endured immense fear and pain during the period of their fathers' captivity. In addition to coping with the trauma of knowing that their fathers were probably being abused, many had to cope with taking on a more adult role or having less adult supervision because of the stress their mothers were experiencing.

Upon their fathers' return from captivity, many of the POWs' children discovered that the nature of the parent-child relationship was altered. Some children suffered the loss of emotional closeness, the loss of parental companionship and affection, and the increased fear and tension which resulted from the changes in their

fathers' personality. For many, the problems persisted well beyond the short term, with some never successfully being resolved. Indeed, one POW's son suffers from increased depression, anxiety, PTSD, and other psychological problems, leaving him unable to work and earn a living.

### Parents and Siblings

The parents and siblings also went through extremely difficult times. All were acutely aware of the likelihood of torture. Many of the parents aged dramatically during the period of their sons' captivity and have never fully recovered from the strain of this ordeal. Returning POWs wanted to protect their parents from the gruesome details of captivity, but their parents sometimes were hurt that their POW sons could discuss those details with others but not with them. Some relationships have been forever changed.

All of the siblings in this case enjoy a very close bond with their brothers who were held and tortured as POWs. As a result, all suffered greatly while their brothers were in captivity, not knowing their conditions and strongly believing that they were being tortured. Moreover, the effects on the siblings have continued, and many of the siblings remain dramatically affected to this day. Lt. Col. Storr's brother David remains haunted by his feelings of helplessness as a "Marine officer who had trained for ten years" but found himself "powerless" to help his brother. David Storr Aff. ¶ 20. Another sibling describes seeing, immediately upon her brother's return, that "the spark that was always so evident in him was gone" and that it was replaced by "the thousand yard stare." Patricia Borden Aff. ¶ 14. The other siblings experienced similar concerns and emotions.

### III. DEFENDANTS

The defendants in this case are Saddam Hussein in his official capacity as President of the Republic of Iraq, the Iraqi Intelligence Service, and the Republic of Iraq.[6]

### A. Saddam Hussein

During these events, Saddam Hussein was the President of a single-party totalitarian state, and simultaneously the Head of State, Chair of the Governing Council, Chairman of the Party, the exclusive appointing authority for all government offices, the director of the budget, the Commander–in–Chief of the Military, and at least the de facto head of the Intelligence Service and all other agencies and instrumentalities of Iraq. *See Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 48 (D.D.C.2001). Saddam Hussein, acting within the scope of his official capacities, is responsible for the torture of the POWs.

In his official capacity, Hussein had direct command responsibility for torture. All of the government agencies and assets of Iraq were ultimately subject to Saddam Hussein's direction and control. According to Ambassador Nathaniel Howell, a former State Department Country Director for Iraq and the United States Ambassador to the State of Kuwait during the Gulf War: "Saddam Hussein and the State of Iraq are essentially synonymous. He is in total control of all aspects of Iraqi government and life ...." Howell Aff. ¶ 9. Further, "Hussein and his officials employ torture, execution, and other forms of coercion at an institutional level against his enemies, real or suspected. The targets are not only those who are perceived to have offended the regime, but also their families." *Id.* ¶ 18.

---

**6.** Because of recent military action in Iraq, the current status of Saddam Hussein and the Iraqi Intelligence Service is uncertain.

An official United States report on Iraqi War Crimes transmitted to the President of the United Nations Security Council concludes that "the mistreatment of U.S. prisoners of war occurred with at least the acquiescence, and probably at the direction, of the Iraqi leadership." *See* Report on Iraqi War Crimes (Desert Shield/Desert Storm), 48th Sess., at 11, U.N. SCOR, U.N. Doc. S/25441 (Mar. 19, 1993).[7] The report concludes that "[r]esponsibility for the treatment of . . . prisoners of war in Iraqi hands clearly lay with the Government of Iraq and its senior officials," and that "the charged violations of the [Geneva Convention] were committed as a result of [Saddam Hussein's] orders, were carried out with his knowledge and approval, or were acts of which he should have had knowledge." *Id.* at 18, 37–38. "The investigation concludes that Iraqi violations of the law of war were widespread and conducted pursuant to the orders or with the approval of the national leadership of Iraq." *Id.* at 6. As Col. David Graham, a special assistant to the Judge Advocate General and an expert in the law of war, testified:

States cannot absolve themselves of liability by claiming that torture occurred under the control of units such as their armed forces or intelligence services. . . . Irrespective of the individual responsibilities that may exist, the Detaining Power is responsible for the treatment given them. Under international law not even a change of government absolves a state of responsibility for its "grave breaches." The High Contracting Parties to the 1949 Geneva conventions are states, not governments of states. Any other rule would seriously undermine these important obli-

gations by permitting a simple change of government to remove all liability and deterrent effect.

Graham Aff. ¶ 10.

### B. *The Iraqi Intelligence Service*

The Iraqi Intelligence Service and its officials were officials, employees and agents of the Republic of Iraq who participated in and provided material support and resources for the torture and mistreatment of American POWs and their families. The POWs were held at the Iraqi Intelligence Service regional headquarters, which was apparently intended to be the POWs' main long-term incarceration site. *See* Appendix O, *The Role of the Law of War* (1992), *in* U.S. Department of Defense Report to Congress on the Conduct of the Persian Gulf War (Apr. 10, 1992), *reprinted in* 31 I.L.M. 615, 630 (1992). Many of the POWs in this case were brutally tortured while held at this facility. "[T]he POWs' treatment while in the hands of Iraqi intelligence . . . personnel was barbarous, cruel, and in clear violation of the [the 1949 Geneva Convention Relative to the Treatment of Prisoners of War]." *See* Report on Iraqi War Crimes (Desert Shield/Desert Storm), *supra*, at 35–36.

Ambassador Howell noted with respect to the Iraqi Intelligence Service that "[t]orture is a recurrent pattern of the way Saddam Hussein governs, and the Iraqi Intelligence Service operates under his direction to carry out these activities." Howell Aff. ¶ 14. He confirmed that "Saddam Hussein provides the Iraqi Intelligence Service with substantial resources and support because it is central to his personal security." *Id.* ¶ 17. Patrick

---

7. The Report, which was transmitted by the Deputy Permanent Representative of the United States, contains conclusions based on extensive evidence accumulated by a Judge Advocate General ("JAG") unit deployed to Iraq. The evidence, obtained through both interviews and documentation, was collected and analyzed by a second JAG unit in the War Crimes Documentation Center in the United States.

Lang, the Defense Intelligence Officer for the Middle East, South Asia, and Counterterrorism in the Defense Intelligence Agency from 1985 until 1992, provided expert testimony that showed that "the POWs who are the plaintiffs in this suit were held and systematically abused in violation of the law of war by the official Iraqi government agencies known as the Iraqi Intelligence Service and the Military Intelligence/Military Security Service and that this abuse could only have occurred through the agency of Saddam Hussein himself acting as president of Iraq." Lang Aff. ¶ 15.

### C. *The Republic of Iraq*

The Republic of Iraq is a "foreign state" as defined by 28 U.S.C. § 1603 of the FSIA. Its torture of, and responsibility for the resulting personal injury to, the American POWs and their families fall squarely within the § 1605(a)(7) exception to the FSIA. Its officials, employees and agents carried out the torture of American POWs in this case, and provided material support for it, while acting within the scope of their office, employment or agency, and with the resulting personal injury to the plaintiff POWs and their family members. Irrespective of individual and institutional responsibilities that also exist, the Republic of Iraq is responsible for the torture of, and personal injury to, plaintiffs.

### CONCLUSIONS OF LAW

### I. JURISDICTION UNDER THE FSIA

The FSIA's enumerated exceptions to sovereign immunity are the basis for subject matter jurisdiction over foreign states and their agencies and instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). The Court has jurisdiction pursuant to the exception set forth in 28 U.S.C. § 1605(a)(7) over suits against states designated by the Department of State as terrorist states with respect to certain acts in which either the claimant or the victim were nationals of the United States.

■ The first statutory element for subject matter jurisdiction pursuant to § 1605(a)(7), as amended,[8] is that "money damages are sought against a foreign state for personal injury ... caused by an act of torture ... or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." This case is such an action for personal injury caused by the torture and the provision of material support and resources for such torture by officials and employees of Iraq while acting within the scope of their office or employment. For purposes of § 1605(a)(7) actions, "torture" is defined in § 1605(e)(1) of the FSIA by reference to § 3 of the Torture Victim Protection Act of 1991. That section defines torture to include:

any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering ..., whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

---

**8.** The 1996 amendment, known as the Flatow Amendment, was enacted as part of the Antiterrorism and Effective Death Penalty Act. 28 U.S.C. § 1605(e)(7) Note.

28 U.S.C. § 1350 note. The treatment of the POW plaintiffs by their Iraqi captors falls squarely within this definition of torture.

■ The second element under § 1605(a)(7) is that the foreign state was designated as a state sponsor of terrorism at the time the act occurred. The Republic of Iraq was designated by the Department of State as a state sponsor of terrorism in September 1990, prior to defendants' torture and mistreatment of the American POWs and their families. *See* 15 C.F.R. § 746.3(b); *Daliberti v. Republic of Iraq*, 97 F.Supp.2d 38, 44 (D.D.C. 2000).

■ The third requirement for subject matter jurisdiction is that, if the act occurred in the foreign state against which the claim has been brought, then the claimant must afford the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration. The plaintiffs in this case repeatedly offered the defendants an opportunity to arbitrate their claims in accordance with accepted international rules of arbitration, yet the defendants did not accept plaintiff's offers.

■ The final element for jurisdiction under § 1605(a)(7) is that either the claimant or the victim must be a national of the United States. Plaintiffs in this case are all nationals of the United States.

■ Because this case was filed pursuant to the Flatow Amendment, there is a further requirement that United States officials, employees or agents would be liable for such acts if carried out within the United States. *See Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 107 (D.D.C.2000). American officials, employees or agents would be liable for similar acts of torture if carried out in the United States. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Nar-*

*cotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Elahi*, 124 F.Supp.2d at 108 n. 14.

All of the requirements contained in § 1605(a)(7) are satisfied in this case and the Court, therefore, has subject matter jurisdiction. Because the Court has subject matter jurisdiction, the service of process achieved here pursuant to § 1608 of the FSIA provides personal jurisdiction over the defendants in this case. 28 U.S.C. § 1330(b); *Daliberti v. Republic of Iraq*, 97 F.Supp.2d at 53.

## II. LIABILITY

■ Section 1605(a)(7), as amended, creates a federal cause of action against officials, employees and agents of a foreign state, as well as the state and its agencies and instrumentalities themselves. *See Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 230–31 (D.D.C.2002); *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 24 (D.D.C.2002); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 7 (D.D.C.2000); *Daliberti*, 97 F.Supp.2d at 43; *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C.2000). Suits brought under § 1605(a)(7) may be based on conventional common law torts such as assault, battery, and intentional infliction of emotional distress. *See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 87 (D.D.C.2002); *Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 45–46 (D.D.C.2001); *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 33–37 (D.D.C. 2001), *aff'd*, 315 F.3d 325 (D.C.Cir.2003); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 47–50 (D.D.C.2001); *Anderson*, 90 F.Supp.2d at 113.

■ The torture of the plaintiff POWs, and the resulting personal injury to them and their family members, constitute the traditional torts of assault, battery and intentional infliction of emotional distress.

"An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *See* Restatement (Second) of Torts § 21(1). The torture of American POWs in this case involved numerous acts by officials, employees or agents of the Republic of Iraq acting within the scope of their office or employment and intending, viciously, to cause either a harmful or offensive contact with a person or an imminent apprehension of such a contact. This satisfies the elements of a cause of action for assault.

■ The torture of the plaintiff POWs also constitutes the tort of battery. "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *See* Restatement (Second) of Torts § 13. The officials, employees and agents of the Republic of Iraq acting within the scope of their office brutally, repeatedly and intentionally caused harmful and offensive contact to the POWs.

■ Defendants are also liable to the POW plaintiffs for the tort of intentional infliction of emotional distress. The elements of a claim for the intentional infliction of emotional distress are (1) conduct by the defendant that is extreme and outrageous; (2) conduct by the defendant that was intentional or reckless, and (3) severe emotional distress suffered by the plaintiff as a result of defendant's conduct. *See* Restatement (Second) of Torts § 46. The defendants engaged in outrageous conduct designed to cause severe emotional distress to the POWs. The Iraqi captors' extreme and outrageous conduct succeeded

in causing severe emotional distress for the POWs. The POWs constantly feared torture and death as a direct result of the severe physical and mental abuse imposed by the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein. The outrageous physical and mental torture by Iraq, the denial of requests to notify family members, the forced propaganda tapes by injured POWs, the refusal to permit the ICRC to inspect the prisoners' conditions, and Iraq's public announcement that POWs would be used as human shields intentionally caused severe and enduring emotional distress for the POWs. *See Jenco*, 154 F.Supp.2d at 33–37; *Sutherland*, 151 F.Supp.2d at 47–50.

■ The plaintiff family members are entitled in their own right to recover for the intentional infliction of emotional distress inflicted on them by defendants, wholly apart from recovering solatium damages for their emotional distress due to the torture of their POW family members. *See, e.g., Jenco*, 154 F.Supp.2d at 35–36. Defendants intentionally refused to comply with their legal obligation under the Geneva Convention to permit a POW to write to his family to inform them of his capture and his state of health. This provision of the Geneva Convention is intended to protect family members as well as POWs. The defendants' actions in this regard were outrageous, were intended to cause emotional distress to the plaintiff family members, were in callous disregard of the risk that such emotional distress would result, and actually caused severe emotional distress to the family members. As a result, the family members have satisfied the necessary elements of a cause of action for the intentional infliction of emotional distress under § 46(1) of the Restatement (Second) of Torts.

Many family member plaintiffs also make out a case of intentional infliction of

emotional distress under § 46(2) of the Restatement. It provides that where the outrageous conduct "is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress ... to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm." Restatement (Second) of Torts, § 46(2)(a); *see also Jenco*, 154 F.Supp.2d at 35–36. When the defendants tortured the POW plaintiffs, they intended to and did cause emotional distress to the POWs' immediate family members. *See Sutherland*, 151 F.Supp.2d at 50. The defendants caused images of battered POWs to be broadcast on television. They made public threats to use the POWs as human shields. These actions generated public reporting and knowledge concerning the defendants' past and ongoing participation in brutal torture. This made immediate family members contemporaneously aware that ·their loved ones were probably being tortured. Thus, these family member plaintiffs were "present" within the meaning of § 46(2) since "family ... present at the time" is "distinguished from [family] who discover later what has occurred." Restatement (Second) of Torts § 46 cmt. 1.

In summary, defendants are liable to plaintiffs under § 1605(a)(7) of the FSIA, as amended, for the personal injuries they intentionally caused when they assaulted and battered the plaintiff POWs and when they intentionally inflicted emotional distress on the POWs and their family members.

## III. COMPENSATORY DAMAGES

### A. *Elements*

Section 1606 of the FSIA provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages ...." 28 U.S.C. § 1606. Section 1605 provides for an award of "money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7)." 28 U.S.C. § 1605 Note.

Calculation of damage awards under the FSIA is governed by the American rule on damages. *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C.Cir.2003). That rule as set forth by the Supreme Court is:

> Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of damages as a matter of just and reasonable inference, although the result be only approximate.

*Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). A plaintiff must "prove the fact of injury with reasonable certainty, [and prove] the amount of damages ... based on a reasonable estimate." *Hill*, 328 F.3d at 684 (quoting *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C.Cir.1997)). "[W]hile damages cannot be awarded on the basis of mere speculation or guesswork, the plaintiff need only provide some reasonable basis on which to estimate damages." *Id.* (internal quotations and citations omitted). To recover damages for future consequences, a "plaintiff must prove that the projected consequences are reasonably certain (i.e., more likely than not) to occur,

and must prove the amount of damages by a reasonable estimate under this circuit's application of *Story*." *Id.* (internal quotations omitted).

### 1. Pain, Suffering and Mental Anguish

 Pain, suffering and mental anguish damages are an important component of damages awarded in § 1605(a)(7) actions. "If Plaintiff presents sufficient evidence of conscious pain and suffering, determination of the compensation has largely been relegated to the discretion of the trier of fact by courts in this jurisdiction based upon factors including the duration and nature of the suffering endured." *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 28 (D.D.C.1998) (citing *Taylor v. Washington Terminal Co.*, 409 F.2d 145 (D.C.Cir.1969), *cert. denied*, 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969)).

In this case, the POWs suffered pain and mental anguish during two separate periods. First, they suffered severe pain and anguish during the period of sustained mental and physical torture while in captivity in Iraq. Second, they endured—and continue to endure—pain and mental anguish resulting from the lasting injuries they sustained during the torture, painful medical treatment for those injuries, and the continuing impact on their relations with loved ones and on their professional life.

### 2. Emotional Distress (Solatium)

 Solatium is compensation damages awarded to loved ones close to a victim for injury to feelings. *See Flatow*, 999 F.Supp. at 30. It includes mental anguish and grief resulting from the actionable conduct. "Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish. The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium." *Id.* Solatium damages for mental anguish and grief include both the time period of the continuing offense and subsequently into the future.[9]

### B. *Application*

This case involves calculated and purposeful actions by Saddam Hussein, his Republic of Iraq, and the Iraqi Intelligence Service to engage in systematic and brutal torture of American POWs while they were held by Iraq during the first Gulf War. It involves systematic and excruciating physical and mental torture carried out by experienced agents of torture in Saddam Hussein's Iraqi Intelligence Service. This physical and mental torture was inflicted throughout the period of captivity in Iraq. Iraq created an all-encompassing environment of physical and mental torture through extreme physical brutality and physical injury, mock executions, threats of death, intense fear, deprivation of medical care and exacerbation of injuries, starvation, severe sleep deprivation, imposition of squalid surroundings, intense cold, demonstrated brutality to fellow prisoners, isolation from contact with family members, fear for family members, and constant attempts to humiliate the POWs. It was accompanied by refusal to notify family members of their loved ones' capture, public threats to use the POWs as human shields, videotaping of forced statements and "confessions," and placement. of POWs in targets vulnerable to attack during the course of hostilities. Because the POWs were intentionally exposed to recurrent sessions of others being tortured, the barbarous conditions of the POWs' confinement made every min-

---

**9.** The family member plaintiffs are not only entitled to solatium damages but, as is discussed above, they also have a cause of action against defendants for the intentional infliction of emotional distress in relation to the torture of their loved ones.

ute of their confinement one of pain, fear and emotional suffering. The pain, suffering and mental agony suffered by plaintiffs in this case did not result incidentally from some other intended act, but was inflicted intentionally to achieve extreme pain, suffering, and mental agony. The fear was greatly intensified because those tortured understood all too clearly that they were in the hands of ruthless men who would continue to escalate their treatment to horrors previously imaginable only in their worst nightmares.

While Iraq's brutal torture produced lasting physical and emotional harm, a major element of damages for the POWs must be recompense for the excruciating pain, suffering and mental anguish throughout their period of captivity in Iraq. A single minute of such torture seemed like a lifetime, but for the POW plaintiffs, it endured beyond minutes to days and weeks. For example, Colonel Acree described interrogations and beatings that "continued around the clock, separated into episodes of twenty minutes to an hour each," and he describes "longing for even a minute without pain." Acree Aff. ¶¶ 14, 16.

The POW plaintiffs will carry with them throughout their lives lasting physical and emotional damage. Some underwent painful medical treatments after release to repair the physical damage done by defendants. As a result, the computation of damages will be divided into two periods— the period of ongoing torture by Iraq and the subsequent period of continuing physical and emotional suffering. The same division will be made for the family members who suffered acute mental anguish

during the period of Iraqi torture of their loved ones, but who have continued to experience the numbing mental anguish resulting in long term consequences to their family.

The Court will award additional damages to those POWs subjected to the torture of specially outrageous actions by Iraq as part of its overall torture beyond its ongoing brutal beatings, physical injury, psychological torture, and barbaric conditions of confinement. These include housing POWs in a legitimate military target resulting in their being bombed, forcing POWs to make videotaped statements or "confessions" to be used as propaganda, intentionally aggravating pre-capture injuries, and conducting circumcision inspections of those POWs suspected by their Iraqi captors of being Jewish.

There are no precisely comparable cases against which to assess damages, but the brutal and extensive pain and suffering intentionally inflicted on the POW plaintiffs require damages that provide sufficient compensation and closure for the injured plaintiffs.

### 1. POW Plaintiffs

██ No one would subject himself for any price to the terror, torment, and pain experienced by these American POWs. There is no monetary award that could adequately compensate them for their suffering and the resulting permanent injury. The Court, however, is charged with providing compensatory damages even where no award can truly compensate. In shaping the most appropriate compensatory damage awards here, the Court will calculate a lump sum award[10] that takes into

---

**10.** Here, the $10,000–per–day–of–captivity formula used in some FSIA cases would not adequately compensate for the unique and egregious harms resulting from the captives' status as POWs. *Cf. Jenco,* 154 F.Supp.2d at 37. Instead, reasonable lump sum estimates

aggregated from elements of each plaintiff's evidence will be used. *Cf. Cronin,* 238 F.Supp.2d at 234–35 (finding that per diem approach was inappropriate because of severity of mistreatment and brevity of confinement).

account pain and suffering during and after the period of captivity, as well as pain and suffering for special outrages and major permanent impairment, as the most appropriate way to award compensation for this experience of unimaginable horror.

With respect to pain and suffering and mental anguish during the period of control and torture by Iraq, all POW plaintiffs in this case were brutally tortured. The torture experienced by each one of these POWs was unspeakable. However, there were clear differences among them, including their overall time spent under Iraqi control and torture. In awarding damages, it is appropriate to differentiate between the more severe and less severe experiences of torture in arriving at the appropriate sum.

Taking into account the relative severity of torture, it is reasonable to divide the POW plaintiffs into three groups in awarding damages for the pain, suffering and mental anguish during the period of torture. The first group includes those eight POWs who were most severely tortured, namely Col. Clifford Acree, Lt. Col. Craig Berryman, Col. (Ret.) David Eberly, CWO (Ret.) Guy Hunter, Lt. Col. H. Michael Roberts, Cmdr. Lawrence Slade, Lt. Col. Dale Storr, and Lt. Col. (Ret.) Jeffrey Tice. Each of these POWs will be awarded $20 million for pain and suffering during their torture.

Members of the second group of POWs will each be awarded $15 million for pain and suffering during captivity. They are Lt. Col. (Ret.) Jeffrey Fox, Sergeant David Lockett, Lt. Col. Russell Sanborn, Maj. Robert Sweet, Lt. (Ret.) Robert Wetzel, and Cmdr. Jeffrey Zaun. The third group of POWs includes former Sergeant Troy Dunlap, Maj. (Ret.) Joseph Small, and Staff Sergeant (Ret.) Daniel Stamaris. They will each be awarded $10 million for pain and suffering during the period they were held as POWs.

■■■ With respect to the pain and suffering during the period following captivity as the POWs attempted to return to a normal life, each POW plaintiff should be awarded a minimum of $2 million. Each has had to learn to deal with a life-shattering experience. Some have undergone recurrent painful medical procedures to seek to undo the physical injury done by the Iraqi torturers. Some have seen their marriages and family lives disrupted. Others have suffered in their professional lives. All have been profoundly affected and may continue to suffer for the rest of their lives. Michael Ambrose, the Director of the Repatriated Prisoner of War Program at the Naval Operational Medicine Institute (NOMI), noted that "many of the POWs continue to suffer from lingering effects of the injuries and medical problems incurred during captivity ... and many of these problems will persist throughout the lifetime of the patients affected." Ambrose Aff. ¶ 15, 16. For each POW plaintiff whose post-captivity psychological injuries have been more severe, additional awards of $5 million should be awarded to those with severe long-term psychological problems and $3 million should be awarded to those with moderately severe long-term psychological problems.[11]

In addition, for each POW Plaintiff suffering with permanent physical impairment from injuries inflicted by their Iraqi

---

11. The determination regarding the existence and severity of long-term psychological problems is based on the affidavits of plaintiffs and the expert medical reports of Dr. Andrew Levin and Dr. Liza Gold. The POW plaintiffs with severe long-term psychological problems are Col. Acree, Lt. Col. Berryman, former Sergeant Dunlap, CWO Hunter, Lt. Col. Fox, and Sergeant Lockett. The POW plaintiffs with moderately-severe ongoing psychological problems are Col. Eberly, Maj. Small, Staff Sergeant Stamaris, and Lt. Col. Storr.

torturers, an additional $2 million should be awarded. The affidavits, medical reports, and expert opinions presented to the Court demonstrate that continuing injury in the period following the POWs' control by Iraq resulting from defendants' torture has continued to affect these men profoundly, physically and emotionally, and is an every day reminder of the brutality inflicted on them. The POW plaintiffs with significant permanent physical impairment are Col. Acree, Lt. Col. Berryman, Lt. Col. Fox, CWO Hunter, Sergeant Lockett, Maj. Sanborn, Cmdr. Slade, Staff Sergeant Stamaris, and Lt. Wetzel.

In addition to these amounts, each POW plaintiff suffering certain special outrages, which are singularly repugnant, deserves additional damage awards. Two million dollars will be awarded to each POW who was confined in a military target that was bombed by Allied forces [12] or whose pre-capture wounds were intentionally aggravated.[13] One million dollars will be awarded to each POW forced to participate in making propaganda videotapes [14] or forced to undergo the trauma of genital inspection motivated by discrimination against Jewish people.[15] *See Hill*, 328 F.3d at 685 (noting additional damages for exacerbation of pre-existing condition); *Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 269 (D.D.C.2002) (awarding $1,000,000 for especially egregious behavior in addition to a baseline amount for each day the plaintiff was held hostage).

Accordingly, the Court makes the following awards to each of the POW plaintiffs as overall compensatory damages for pain and suffering: [16]

| | |
|---|---|
| *Col. Clifford Acree* | $35,000,000 |
| *Lt. Col. M. Craig Berryman* | $33,070,000 [17] |
| *Former Sergeant Troy Dunlap* | $17,000,000 |
| *Col. (Ret.) David Eberly* | $29,000,000 |
| *Lt. Col. (Ret.) Jeffrey D. Fox* | $30,000,000 |
| *CWO (Ret.) Guy Hunter* | $32,000,000 |
| *Sergeant David Lockett* | $26,000,000 |
| *Lt. Col. H. Michael Roberts* | $25,000,000 |
| *Lt. Col. Russell Sanborn* | $19,000,000 |
| *Cmdr. Lawrence Randolph Slade* | $28,000,000 |
| *Maj. (Ret.) Joseph Small* | $16,000,000 |
| *Staff Sergeant (Ret.) Daniel Stamaris* | $19,000,000 |
| *Lt. Col. Dale Storr* | $28,000,000 |
| *Maj. Robert Sweet* | $19,000,000 |
| *Lt. Col. (Ret.) Jeffrey Tice* | $26,000,000 |
| *Lt. (Ret.) Robert Wetzel* | $25,000,000 |
| *Cmdr. Jeffrey Zaun* | $21,000,000 |

### 2. Spouses

Awards to spouses for mental anguish and solatium in § 1605(a)(7) cases have ranged between $8 million and $12 million.[18] As was done for the POW plaintiffs, the spouses' awards for pain and suffering will be a lump sum representing an award for the suffering they endured during their husbands' period of captivity in Iraq and an award for their suffering following the release of their loved ones. The suffering the wives endured while

---

**12.** Col. Acree, Lt. Col. Berryman, Col. Eberly, Lt. Col. Fox, CWO Hunter, Lt. Col. Roberts, Cmdr. Slade, Lt. Col. Storr, Lt. Col. Sweet, Lt. Col. Tice, Lt. Wetzel, and Cmdr. Zaun.

**13.** Col. Acree, Lt. Col. Fox, Sergeant Lockett, Staff Sergeant Stamaris, and Lt. Wetzel.

**14.** Col. Acree, Lt. Col. Berryman, Col. Eberly, Lt. Col. Fox, CWO Hunter, Lt. Col. Roberts, Cmdr. Slade, Lt. Col. Tice, Lt. Wetzel, and Cmdr. Zaun.

**15.** Col. Acree, Lt. Col. Berryman, Col. Eberly, Lt. Col. Fox, Cmdr. Slade, Maj. Small, Lt. Col. Storr, Lt. Col. Tice, Lt. Wetzel, and Cmdr. Zaun.

**16.** The Court declines to deduct the small amounts received by some plaintiffs from the United Nations Claims Commission. *See Hill*, 175 F.Supp.2d at 48 (no deduction for these small, non-exclusive payments).

**17.** Lt. Col. Berryman is awarded the $70,000.00 in lost wages he established through his affidavit. Craig Berryman Aff. ¶ 32.

**18.** *See, e.g., Weinstein*, 184 F.Supp.2d at 23 ($8 million damages award to spouse); *Higgins v. Islamic Republic of Iran*, 2000 WL 33674311 (D.D.C. Sept.21, 2000) ($12 million damages award to spouse).

their husbands were in captivity was severe and acute. They did not know at times whether their husbands were alive or dead. Without official notification of their husbands' captivity and health status, the wives were left to imagine the worst. They were afraid to hope and then have those hopes shattered. They were besieged by media requests for interviews, but feared that their words or images could be altered and used by the Iraqis to torment their husbands. An award of $4 million to each spouse is proper compensation for her suffering during the period of her husband's confinement.

██ The award to each spouse for her mental anguish and emotional distress following her husband's release should be $6 million. This in no way suggests that the wives suffered more severely after their husbands returned home and it does not minimize the spouses' intense suffering during the period of captivity. Instead, this amount recognizes that the post-captivity emotional distress is significantly more long-lasting. It is also compensation for each wife's loss of the life she had before her husband was captured in Iraq and which she could have reasonably expected to continue but for the egregious misconduct of the defendants. The spouses have been unintentionally stung by thoughtless comments. For example, one wife was told by her husband that she had left more food on her plate than he had to eat the entire time he was a POW. Leigh Berryman Aff. ¶ 15. They have lost sleep when their husbands suffer recurring nightmares or need to talk about their all too real experiences in Iraq. They find themselves now married to men whom they love dearly, but who differ in many ways from the men they married. They have more limited social relationships because of their husbands' physical problems or because they find it more difficult to develop personal relationships. This emotional distress, while less severe than that they endured during the weeks their loved ones were held captive in Iraq, has lasted for twelve years and may continue for years to come.

The Court, therefore, awards $10,000,000 each to the following spouses: Cynthia Acree, Leigh Berryman, Barbara Eberly, Mary Hunter, Patricia Roberts, Anna Slade, Leanne Small, and Jacqueline Wetzel. Each $10,000,000 award represents $4 million for the mental anguish and emotional distress during the period of a husband's captivity and $6 million for mental anguish and emotional distress following a husband's release.

### 3. Other Family Member Plaintiffs

██ Awards to family members for mental anguish and solatium in § 1605(a)(7) cases have been made in the range $5 million to $12 million for children,[19] $5 million for parents,[20] and $2.5 million to $5 million for siblings.[21] Iraq's failure to permit notification of their loved ones' capture, public threats to use POWs as human shields, use of propaganda video of obviously tortured POWs, and its exposed use of brutal torture caused the POWs' family members, as was true for the POWs' wives, to suffer severe emotional distress during the period of captivity of their loved ones. The family members have continued to suffer as the POWs have sought to recover from their torture.

---

19. *See, e.g., Weinstein,* 184 F.Supp.2d at 23 ($5 million damages award to children); *Higgins,* 2000 WL 33674311 ($12 million damages award to child).

20. *See, e.g., Stethem,* 201 F.Supp.2d at 79 ($5 million damages award to parents).

21. *See, e.g., Surette v. Islamic Republic of Iran,* 231 F.Supp.2d 260, 273 (D.D.C.2002) ($2.5 million damages award to sibling); *Elahi,* 124 F.Supp.2d at 112 (D.D.C.2000) ($5 million damages award to siblings).

Based on the severity of their emotional distress and the past precedents in damage awards to family members in § 1605(a)(7) cases, the Court awards $5 million in compensatory damages to each of the following family members: Children—Timm Eberly, Laura Hunter, William Hunter, Mary Elizabeth Hunter, and Starr Barton; Parents—Gail Stubblefield, Arthur Sweet, Mary Ann Sweet, William Wetzel, Calvin Zaun, and Marjorie Zaun; and Siblings—Ronald Dunlap, Tim Fox, Patricia Borden, Nancy Gundersen, Terry Fox, Robert Fox, David Storr, Douglas Storr, Diane Storr, Michael Sweet, Margaret Wetzel, Kate Farber, Anne Kohlbecker, Ed Wetzel, James Wetzel, Paul Wetzel, Sally Devin, and Linda Zaun Lesniak. Each $5 million award represents $2.5 million for the mental anguish and emotional distress during the period of their loved ones' captivity and $2.5 million for their mental anguish, emotional distress, and any economic damage they incurred following the POWs' release.

## IV. PUNITIVE DAMAGES

 Under the FSIA, a foreign state is exempt from liability for punitive damages, but punitive damages may be awarded against an agency or instrumentality by which a foreign state commits acts of torture. *See* 28 U.S.C. § 1606. General tort law principles determine whether punitive damages should be awarded and, if so, how extensive they should be. The elements include the character of the defendants' acts, the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, the need for deterrence, and the wealth of the defendants. *Flatow,* 999 F.Supp. at 32.

In this case, the Iraqi captors thought—correctly or incorrectly—that the POWs had information of strategic value. They wanted to extract this information by any means, which drove them to subject the POWs, particularly the pilots, to intense interrogation and torture. Defendants also considered the POWs to have strategic propaganda value that could be exploited. These inducements to torture handcuffed and blindfolded POWs resulted in unrestrained savagery against the POWs, causing them to suffer intense, justified fear that the Iraqi threats of death and dismemberment would be carried out. Because of these inducements to use torture, there must be a premium on protecting POWs. POWs are uniquely disadvantaged and deterring torture of POWs should be of the highest priority.

Punitive damages are particularly appropriate in seeking to deter terrorist states from engaging in the heinous acts designated for § 1605(a)(7) actions, including torture, extrajudicial killing, aircraft sabotage, and hostage taking. Courts have awarded substantial punitive damages in § 1605(a)(7) cases where plaintiffs requested such an award and the defendants in the case fell within a category subject to a punitive damage award. *See, e.g., Hill,* 175 F.Supp.2d at 48 ($300 million in punitive damages against Saddam Hussein).

 Plaintiffs in this case seek substantial punitive damages against the Iraqi Intelligence Service and Saddam Hussein. Creating incentives for the agencies and instrumentalities of terrorist nations to comply with their obligations not to torture POWs serves the highest public purpose. Plaintiffs in this case not only seek to obtain appropriate recompense for their own injuries but also to take actions which will deter others in the future from torturing American POWs.[22]

---

**22.** Pursuant to this objective, they have formed a non-profit foundation for the assistance of American and Allied POWs/MIAs and

The Court has considered a number of factors in assessing punitive damages. These include the exceedingly heinous nature of the acts of torture against these POWs, the severe and continuing harm to plaintiffs caused by defendants' reprehensible actions, the fact that such acts are repugnant to civilized society, and the fact that such acts were carried out by defendants as part of a systematic effort to obtain information from the POWs and to punish and intimidate Allied POWs. The record also contains evidence of the value of Saddam Hussein's personal fortune and expenditures made that supported the Iraqi Intelligence Service. Ambassador Howell states a "low-end estimate of Hussein's wealth would be $2 billion." Howell Aff. ¶ 16. The expenditures in 1990 for Hussein's presidential guard units, including the Iraqi Intelligence Service, has been calculated at "roughly three billion dollars." *See* Affidavit of Morris D. Busby, reaffirming October 9, 2001 testimony presented in *Hill v. Iraq.*

Only a very sizable award would be likely to deter the torture of American POWs by agencies or instrumentalities of Iraq or other terrorist states in the future. Taking these factors into account, the Court awards punitive damages against the Iraqi Intelligence Service and Saddam Hussein in his official capacity, jointly and severally, in the amount of three hundred six million dollars ($306,000,000) to be shared equally among all POW plaintiffs.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law,[23] judgment will be entered in plaintiffs' favor and against defendants, in the amounts set forth above, in a separate Final Judgment to accompany these findings and conclusions. Plaintiffs shall, at their own expense, provide notice of this judgment as required by 28 U.S.C. § 1608(e). They shall arrange for the Final Judgment to be translated into Arabic and present the translated Final Judgment to the Clerk of the Court. The Clerk shall cause copies of the translated Final Judgment to be addressed and dispatched to the United States Secretary of State in Washington, D.C., to the attention of the Director of Special Consular Services, for service upon defendants through diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4).

### FINAL JUDGMENT

For the reasons stated in the accompanying Findings of Fact and Conclusions of Law, it is hereby

ORDERED that judgment be, and hereby is, entered in favor of plaintiffs against defendants Republic of Iraq, Saddam Hussein, and the Iraqi Intelligence Service and plaintiffs are awarded compensatory damages against all defendants, jointly and severally, as follows:

| | |
|---|---|
| Col. Clifford Acree | $35,000,000 |
| Lt. Col. M. Craig Berryman | $33,070,000 |
| Former Sergeant Troy Dunlap | $17,000,000 |
| Col. (Ret.) David Eberly | $29,000,000 |
| Lt. Col. (Ret.) Jeffrey D. Fox | $30,000,000 |
| CWO (Ret.) Guy Hunter | $32,000,000 |
| Sergeant David Lockett | $26,000,000 |
| Lt. Col. H. Michael Roberts | $25,000,000 |
| Lt. Col. Russell Sanborn | $19,000,000 |
| Cmdr. Lawrence Randolph Slade | $28,000,000 |
| Maj. (Ret.) Joseph Small | $16,000,000 |
| Staff Sergeant (Ret.) Daniel Stamaris | $19,000,000 |
| Lt. Col. Dale Storr | $28,000,000 |
| Maj. Robert Sweet | $19,000,000 |
| Lt. Col. (Ret.) Jeffrey Tice | $26,000,000 |
| Lt. (Ret.) Robert Wetzel | $25,000,000 |
| Cmdr. Jeffrey Zaun | $21,000,000 |
| Cynthia Acree | $10,000,000 |
| Leigh Berryman | $10,000,000 |

their families and they have committed to assign a substantial amount of any punitive damages awarded in this case to that Foundation.

**23.** Any finding of fact which is more properly a conclusion of law and any conclusion of law which is more properly a finding of fact shall be construed accordingly.

| | |
|---|---|
| Barbara Eberly | $10,000,000 |
| Mary Hunter | $10,000,000 |
| Patricia Roberts | $10,000,000 |
| Anna Slade | $10,000,000 |
| Leanne Small | $10,000,000 |
| Jacqueline Wetzel | $10,000,000 |
| Timm Eberly | $ 5,000,000 |
| Laura Hunter | $ 5,000,000 |
| William Hunter | $ 5,000,000 |
| Mary Elizabeth Hunter | $ 5,000,000 |
| Starr Barton | $ 5,000,000 |
| Gail Stubblefield | $ 5,000,000 |
| Arthur Sweet | $ 5,000,000 |
| Mary Ann Sweet | $ 5,000,000 |
| William Wetzel | $ 5,000,000 |
| Calvin Zaun | $ 5,000,000 |
| Marjorie Zaun | $ 5,000,000 |
| Ronald Dunlap | $ 5,000,000 |
| Tim Fox | $ 5,000,000 |
| Patricia Borden | $ 5,000,000 |
| Nancy Gundersen | $ 5,000,000 |
| Terry Fox | $ 5,000,000 |
| Robert Fox | $ 5,000,000 |
| David Storr | $ 5,000,000 |
| Douglas Storr | $ 5,000,000 |
| Diane Storr | $ 5,000,000 |
| Michael Sweet | $ 5,000,000 |
| Margaret Wetzel | $ 5,000,000 |
| Kate Farber | $ 5,000,000 |
| Anne Kohlbecker | $ 5,000,000 |
| Ed Wetzel | $ 5,000,000 |
| James Wetzel | $ 5,000,000 |
| Paul Wetzel | $ 5,000,000 |
| Sally Devin | $ 5,000,000 |
| Linda Zaun Lesniak | $ 5,000,000 |

It is further ORDERED that punitive damages in the amount of $306,000,000 be, and hereby are, awarded jointly and severally against defendants Saddam Hussein and the Iraqi Intelligence Service to be shared equally among all the POW plaintiffs. It is further

ORDERED that plaintiffs shall, at their own expense, provide notice of this Judgment as required by 28 U.S.C. § 1608(e). They shall arrange for the Judgment to be translated into Arabic and present the translated Judgment to the Clerk of Court. The Clerk shall cause copies of the translated Judgment to be addressed and dispatched to the United States Secretary of State in Washington, D.C., to the attention of the Director of Special Consular Services, for service upon defendants through diplomatic channels, pursuant to 28 U.S.C. § 1608(a)(4).

This is a final, appealable order.